## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **LAURA J. MAKRAY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civ. Action No. 12-0520 (BAH)** |
| | ) | |
| **THOMAS E. PEREZ,** | ) | |
| **Secretary Of Labor,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## PLAINTIFF'S OPPOSITION TO
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### PRELIMINARY STATEMENT

Laura Makray, the plaintiff in this action, is a superbly qualified expert auditor in the field of Quality Assurance.  Ms. Makray has, in over 20 years of federal service, personally conducted, supervised, and/or reviewed countless OIG audits and is currently employed by the United States Department of Labor's Office Inspector General ("DOL OIG"), where this case arose.  Makray Decl., ¶ 1, 7-8; Exh. 1.  She is exceptionally experienced in the field of Quality Assurance at DOL OIG and other government agencies.  Makray Decl., ¶¶ 1, 7-8; Exh. 1.  OIG itself recognizes Ms. Makray as an expert in the field of Quality Assurance within OIG and she is recognized throughout OIG's highest ranks as the organization's "go to" person about Quality Assurance.  Donovan Decl., ¶¶ 4-9; Woodford Dep. at 51.

Ms. Makray served as Assistant Director in the DOL OIG Headquarters Office of Audit Quality Assurance ("OAQA") from June 2006 to September 2007.  Makray Decl., ¶ 8; Exh. 1.  This case concerns defendant's failure to select Ms. Makray for the GS-15 position as Director of that same office in January of 2011, when it passed her over and selected an immensely unqualified

male candidate, Melvin Reid.  Mr. Reid's experience in DOL OIG's Quality Assurance program was at best marginal and not even included on his resume.  Exh. 3.

Repeatedly, defendant contends that one of the most prominent reasons it selected Mr. Reid was that he was "in an acting capacity" as Director of OAQA "when interviewing before an interview panel."  Def. Mot. at 4; accord Def. Mot. at 9, 18, 22, 22 n.6, 23.  ***Conspicuously unmentioned*** by defendant is that Mr. Reid's stint as acting Director lasted for a grand total of six weeks, excluding the Thanksgiving, Christmas, and New Year's holidays.  Raponi ROI Aff. at 4; Dixon ROI Aff. at 3; Raponi Dep. at 25; Exh. 35; Exh. 34 at 2.  ***Also unmentioned by defendant*** is that under Mr. Reid's acting stewardship, the Office of Quality Assurance produced exactly one of the 67 reports it published during that fiscal year.  Raponi Dep. at 23; Exh. 20 at 8 (OIG Website reflecting audit reports issued in FY 2011).

Mr. Reid's leadership skills were minimal going into his acting assignment and nothing changed as a result of it.  The senior-most OIG official directly involved in the selection process, Deputy Assistant Inspector General for Audit ("Deputy AIGA") Michael Raponi, annually rated both Ms. Makray and Mr. Reid.  In her performance appraisal leading into the OAQA Director position, Mr. Raponi gave Ms. Makray a rating of "Exceeds" in leadership, while his rating of Mr. Reid's leadership was middling.  Exh. 2 at 42-43; Exh. 10 at 17.  He was even forced to admit at his deposition that he did not know "anything specific" that Mr. Reid "actually did" during his brief acting assignment, "how much work" Mr. Reid "actually got done as acting director," or of a single Quality Assurance review Mr. Reid supervised during that period.  Raponi Dep. at 23, 25.  Nor did Mr. Reid.  Reid Dep. at 27-28.

This selection for Director of Quality Assurance was not the only time that defendant discriminated against Ms. Makray when she sought promotion to Grade 15.  For example, in 2008,

Ms. Makray applied to be Director of another OIG office, and Mr. Raponi served as the selecting official.  Makray Decl., ¶ 16; Exh. 3; Exh. 4.  After Ms. Makray was interviewed, defendant cancelled that competition and put a male in the position, who later withdrew his application because he no longer wanted to be a supervisor, "temporarily" for two years on an acting basis. Makray Decl., ¶ 16; Exh. 4; Exh. 5.  Then, OA abolished the position.  Makray Decl., ¶ 16.

Defendant has expended a considerable amount of energy fending off Ms. Makray's claims by arguing that it did not discriminate against her on the basis of her race.  Def. Mot. at 8.  That is not very difficult to do; Ms. Makray only claims to have been discriminated on the basis of sex. Cplt. [ECF #1] Counts I, II.[1]  It is also not very effective as subterfuge.  Noticeably absent from defendant's elaborate dispositive motion is the striking deposition testimony of Barbara Warren who, until Deputy AIGA Raponi joined OIG, was a highly successful Audit Director for DOL OIG Headquarters.  She became his target for discriminatory actions – including pervasive interference with her authority as a supervisor, unfounded accusations of leave abuse, and an unprecedented negative performance appraisal – which led her to take early retirement.  Warren Dep. at 19-20, 35-55, 60-62, 65-66, 79, 93-94, 99-100.

Defendant contends that Mr. Reid's selection was the inevitable result of a neutral personnel process.  Def. Mot. at 9, 16.  That is hardly the case.  The HR process leading up to panel interviews was meaningless.  Mr. Reid's application made no mention of his work at DOL OIG; he made up for that by fabricating his academic background.  HR did not even bother screening the three candidates referred for consideration, but just sent forward Ms. Makray and Mr. Reid, along with Mark Lemke, the male, bottom-ranked candidate, as a courtesy because he was in-house. Raponi Dep. at 72; Cropper Dep. at 104, 110; Exh. 7.  Once he learned how badly

---

[1]      Its statement of law in the context of employment discrimination is also hopelessly out-dated.  Compare Brady v. Office of Sgt. at Arms, 20 F.3d 490, 494 (D.C. Cir. 2008) with Def. Mot. at 6-10.

HR fell down on the job, a senior OIG manager was forced to admit at his deposition that he did not know how Mr. Reid was even interviewed.  Exh. 3; Woodford Dep. at 68-69.  One panelist's interview notes are gone, in violation of 29 C.F.R. § 1602.14; 5 C.F.R. § 335.103; and IG Directive 3-335 at 23; Yarbrough Dep. at 70.  The notes of the other two are very sketchy.  Exh. 8.  Mr. Raponi has no recollection at all of the substance of the candidates' interviews – least of all a discussion of their experience – and none of the panelists have a specific recollection of the candidates' responses.  Raponi Dep. at 63-64; 79; Yarbrough Dep. at 48; Dixon Dep. at 41, 43, 47-48.  The "absence of documentation" provides grounds for "a reasonable jury to doubt" that a full set of interview notes would document defendant's supposed reasons for selecting Mr. Reid. Hamilton v. Geithner, 666 F.3d 1344, 1356 (D.C. Cir. 2012).

This case would be strikingly similar to Hamilton, if it weren't so much worse.   In Hamilton, the D.C. Circuit reversed an award of summary judgment because the plaintiff presented evidence of "significant disparity in the candidates' qualifications," the "highly subjective nature" of the employer's proffered non-discriminatory reasons for its selection, and the absence of any contemporaneous documentation to support the employer's proffered explanation.  Id. at 1357. Here, there is even more evidence of sex discrimination.  The Supreme Court has expressly recognized the probative value of an employer's past discrimination, not only against a plaintiff herself, but also toward other women.  See Sprint v. Mendelsohn, 520 U.S. 379, 381 (2008); United Airlines v. Evans, 431 U.S. 553, 558 (1977); National Railroad Passenger Corp. v. Morgan, 536 U.S. 101, 113 (2002).  Defendant has a lengthy history of discriminating against women on the basis of their sex, and in fact, has a lengthy history of discriminating against Ms. Makray herself. Makray Decl., ¶¶ 16, 17; Warren Dep. at 19-20, 35-55, 60-62, 65-66, 79, 93-94, 99-100.

An inference of discrimination may be drawn and summary judgment denied when, even standing alone, the record shows that the plaintiff is <u>significantly</u> more qualified than the selectee. It also must be drawn when, combined with evidence of a plaintiff's superior qualifications, there is evidence that the "employer's explanation misstates the candidates' qualifications," or "contradicts other contemporaneous accounts of [its] decision" <u>Aka v. Washington Hospital Center</u>, 156 F.3d 1284, 1294-95 (D.C. Cir. 1998) (<u>en</u> <u>banc</u>).  It may also do so with evidence of an employer's demonstrated history of discrimination.  <u>United Airlines</u>, 431 U.S. at 558; <u>Sprint</u>, 520 U.S. at 381.  If <u>Aka</u> teaches anything, it is that evidence of <u>even one</u> of these types is sufficient to take an employment case to trial.  <u>Aka</u>, 156 F.3d at 1294-98.  Ms. Makray has evidence of <u>all</u> of these types.

<u>**STATEMENT OF THE CASE**</u>

<u>**Introduction**</u>

Laura Makray is a highly accomplished auditor with over twenty years of both federal civilian and military service.  Makray Decl., ¶¶ 1, 7-9; Exh. 1.  In her more than two decades as an auditor, Ms. Makray has personally conducted, supervised, and reviewed audits of all types both inside and outside of DOL; served in DOL's Office of Quality Assurance; written national DOL OIG audit policies and procedures; developed and provided training to DOL OIG and to the federal audit community at-large; and served as the OIG Office of Audit's in-house expert in Quality Assurance. Exh. 1;  Makray Decl., ¶¶ 7-9; Donovan Decl., ¶ 9; Allen Decl., ¶¶ 4-6; Edwards Decl., ¶ 2-3, 5, 9; Gers Decl., ¶ 9.  DOL has recognized her significant contributions to the improvement of OA's auditing process with numerous awards, cash bonuses, and exemplary performance appraisals.  Exh. 2; Exh. 9; Makray Decl., ¶ 8.  Defendant's own senior management has described

Ms. Makray as having a breadth of knowledge that is "a mile wide and probably five miles deep." Woodford Dep. at 50.[2]

Nonetheless, in January of 2011, defendant passed Ms. Makray over for the position of Director of the Office of Audit Quality Assurance in favor of a demonstrably unqualified male, Melvin Reid.  The one manager who supervised them both admitted at his deposition that Ms. Makray was the stronger candidate.  Coyle Dep. at 57-59, 90.  One of the interview panelists for the position admitted to two colleagues that Ms. Makray performed better at the interview and was more qualified for the job.  Edwards Decl., ¶ 8; Allen Decl., ¶ 7.  Mr. Reid's resume and application were filled with fictitious accomplishments that defendant was well aware of.  Exh. 3; Reid Deposition at 30, 34-35; Exh. 10.

The Office of Audit has an extensive history of discriminating against women.  In fact, Ms. Makray's non-selection as Director of OAQA served as at least the fourth time that defendant passed her over for a promotional opportunity, or blocked her from competing for a position that she was significantly qualified for, in favor of a male.  In 2008, instead of selecting her to be the director of the office she was currently working in, defendant placed a male candidate who had withdrawn his application because he was no longer interested in being a supervisor in the position on an acting basis for two years before abolishing it.  Exh. 6; Makray Decl., ¶ 16; Makray Dep. at 196.  In May of 2010, defendant turned the tables, transferring a male into a job that Ms. Makray had already been performing for two years. Makray Decl., ¶ 16.  Then, in November of 2010,

---

[2]        Defendant somehow believes that Ms. Makray's superior performance, despite its history of discriminating against her, disproves its current animus toward her under the "same actor" inference.  Def. Mot. at 8-9.  In fact, Mr. Raponi twice instructed Ms. Makray's first-level supervisors to lower her performance appraisals.  Makray Decl., ¶ 16; Exh. 2 at 28, 52.  Nonetheless, the D.C. Circuit Court has cautioned that the same actor inference "cannot immunize [an employer] from subsequent discrimination," nor is it "alone sufficient to keep this case from [a] jury."  Czekalski v. Peters, 475 F.3d 360, 369 (D.C. Cir. 2007).  It is "just that, an inference."  Valles-Hall v. Center for Non-Profit Advancement, 481 F. Supp. 2d 118, 151 (D.D.C. 2007).  Being nothing more than a permissive inference, the same actor defense counts for nothing on summary judgment.  See Anderson v. Liberty Lobby, 477 U.S. 242, 255 (1986).

defendant direct-reassigned the then-OAQA Director over Ms. Makray in an office that she was already assigned to.  Makray Decl., ¶ 16. This final machination, of course, created the OAQA Director vacancy that is the subject of this litigation.

At least four other women have also faced abhorrent treatment while working in OA.  One was forced into early retirement because of Raponi's discriminatory treatment of her.  Warren Dep. at 19-20, 35-55, 60-66, 79, 93-94, 100.   Yet another highly regarded OA Director's role became increasingly diminished upon Mr. Raponi's arrival to DOL up until her retirement. Makray Decl., ¶ 17.  A third left the agency to avoid facing Mr. Raponi.  Exh. 30; Makray Decl., ¶ 17.  A fourth was forced to remain as a GS-13 instead of being promoted to Audit Manager despite performing identical duties as the GS-14 males above her.  Edwards Decl., ¶¶ 10-17.

**Officials, Functions, and Structure of DOL OIG's Office of Audit**

The functions of DOL OIG Office of Quality Assurance ("OAQA") and the duties of its Director can only be appreciated with an understanding of the structure of DOL OIG Headquarters' Office of Audit ("OA").  The Office of Audit is one of the large organizational entities within DOL OIG.  Exh. 11 at 1; Makray Decl., ¶ 3.  It is headed by an Assistant Inspector General for Audit ("AIGA"), who at all times relevant was Elliot Lewis, and a Deputy Assistant Inspector General for Audit ("DAIGA"), who at all times relevant was Michael Raponi.  Makray Decl., ¶ 3;Exh. 11 at 1; Lewis Dep. at 4; Raponi Dep. at 4-5.  The role of OA is to "conduct and supervise independent objective audits of agency programs and operations"; "promote economy, effectiveness, and efficiency within the Agency"; and "review and make recommendations regarding existing and proposed legislation and regulations relating to agency programs and operations." Exh. 11 at 1.[3]

---

[3]   OA is responsible for conducting a number of different types of audits, including performance audits, financial audits, and attestation engagements.  Exh. 11 at 2; Makray Decl., ¶ 3.  Performance audits are perhaps the most common and universally-known type of audits.  They entail an "independent assessment" of a particular program's performance and management, and are measured up against objective criteria including standards,

At or around the time of the actions that gave rise to Ms. Makray's complaint, the Office of Audit HQ had three operating units operating:  OAQA; the Office of Policy, Audit, Management, and Reporting ("OPAMR"); [4] and the Office of Audit Operations ("OAO").  Exh. 11 at 1; Makray Decl., ¶ 5.  Each of these divisions was headed by a GS-15 office Director, who in turn reported to the DAIGA, Mr. Raponi.  Exh. 11 at 1; Makray Decl., ¶ 5; Raponi Dep. at 4-5. Ms. Makray has worked for all three offices, and their roles are heavily intertwined and directly related to quality and auditing standards.  Makray Decl., ¶ 5.

### The Role of a Quality Assurance Office

Quality Assurance is a highly specialized field of the audit profession that requires a deep knowledge and understanding of auditing standards, so thorough that Quality Assurance can only be mastered after many years.  The role of the DOL OAQA is to ensure that all OIG audits adhere to controlling auditing standards, as well as to any other governing rules and regulations, before being issued.  Exh. 11 at 123-28; Makray Dep. at 44; Makray Decl., ¶ 6.  "OAQA is an integral part of the quality control process" because it determines whether an audit meets the relevant standards and "evaluates the adequacy of policies and procedures established by" the Office of Audit.  Exh. 11 at 125.  An in-depth appreciation of these detailed and often highly-technical requirements is essential to success in any QA office.  Makray Decl., ¶ 6; Donovan Decl., ¶¶ 5, 7.

Quality Assurance is governed by Generally Accepted Government Auditing Standards ("GAGAS"), the professional standards and guidance that "provide a framework for conducting high quality-government audits and attestation engagements with competence, integrity,

---

benchmarks, and best practices.  Exh. 11 at 2.  The objectives of performance audits may include assessing program effectiveness and results, economy and efficiency, internal control, compliance with guidelines or requirements, and providing the program prospective analyses, guidance, or summary information.  Exh. 11 at 2.
[4]      OPAMR was abolished in 2010 and its functions now primarily fall under the responsibility of the Office of Audit Operations.  Makray Decl., ¶ 16.

objectivity, and independence." Exh. 13, Chapter 1.03; Exh. 11; Makray Decl., ¶ 4.  Ms. Makray

is not only well-versed in GAGAS, she instructs DOL OIG auditors on these standards.  Makray

Decl., ¶¶ 7, 8.

There are two principal functions of a Quality Assurance program that are directly relevant

to this case.  One is performing quality control reviews ("QCR's") under a quality control system

that places "emphasis on performing high quality work," and an organization's policies and

procedures, which are "designed to provide reasonable assurance" of compliance with professional

standards, laws, and regulations.  Exh. 14; Exh. 11 at 123-26; Makray Decl., ¶ 6.[5]  The other is

participating in the government-wide external peer review process governed by the Counsel of the

Inspectors General on Integrity and Efficiency ("CIGIE").  Exh. 11 at 128; Coyle Dep. at 13;

Makray Decl., ¶ 6.  The peer review program is designed to serve as an external and independent

review of all OIGs' quality control systems to determine whether they comply with and meet

auditing standards. Exh. 11 at 128.  Participating OIG's are reviewed every three years and are

"generally reserved for those people most expert in quality reviews and peer review procedures."

Donovan Decl., ¶ 9; Makray Decl., ¶ 3.  That would be Ms. Makray.  Donovan Decl., ¶5.

### Ms. Makray's Superior Service At DOL OIG

OIG's Director of Financial Statement Audits has "not known anyone in OIG/OA who [is]

better at quality assurance reviews or had more knowledge of quality assurance standards than Ms.

Makray."  Donovan Decl., ¶4.   Some of this case, but by no means all of it, turns on the naked

superiority of Ms. Makray's qualifications, and in particular her experience in Quality Assurance

and leadership.  Defendant suggests that Ms. Makray has only one year and three months of

---

[5]      OAQA is also responsible for performing Independent Referencing Reviews ("IRR's"), which are much less involved than QCR's and are merely "designed to verify facts and figures contained in reports."  Exh. 11 at 127; Makray Decl., ¶ 6; Gers Decl., ¶ 3.  This is accomplished by verifying references within the audit report and noting and resolving any discrepancies discovered by the review.  Exh. 11 at 127; Gers Decl., ¶ 3.

experience in Quality Assurance work, and that in this respect, had significantly less directly-related experience to the OAQA Director position than Mr. Reid.  Def. Mot. at 3-4; Raponi ROI Aff. at 4-5.  It also seems to assert that she has no leadership experience whatsoever.  Def. Mot. at 20.  Neither of these points could be farther from the truth.  Defendant's own management recognized Ms. Makray as an exceptional leader leading into the OAQA Director competition. Exh. 2 at 19, 29, 42; Makray Decl., ¶ 10.  At the time of the vacancy, Ms. Makray had nearly twenty years of experience in Quality Assurance, capped with her exceptional performance at DOL; had twenty years of military experience where she retired as a major; and had played a leadership role in every auditing position that she held from the start of her career.  Makray Decl., ¶¶ 7-9; Exh. 1; Exh. 2.

Ms. Makray joined DOL in 2006 after being competitively selected for a promotion to the position of Assistant Director/Senior Auditor with DOL's OAQA.  Exh. 1 at 2; Makray Dep. at 24; Makray Decl., ¶ 8.  This, of course, was before Mr. Raponi had come on board with the agency. Raponi Dep. at 6.  As an Assistant Director, Ms. Makray was responsible for ensuring the quality of audit products before they were issued to ensure that they adhered to standards, were accurate, and were sufficiently supported.  Exh. 1 at 2; Makray Decl., ¶ 8.  She performed at least twenty Quality Assurance reviews during her official time in OAQA, participated in every peer review the agency performed, assisted in DOL's internal peer reviews, and developed and conducted auditor training on audit areas that emphasized GAGAS, quality control, and Quality Assurance. Exh. 1 at 2; Makray Decl., ¶ 8; Donovan Decl., ¶ 9; Exh. 2.

Ms. Makray was so skilled in Quality Assurance that management had her train other auditors in QA.  Makray Decl., ¶ 8; Makray Dep. at 29; Donovan Decl., ¶ 10.  She was instrumental in instructing the DOL Office of Audit on Audit Documentation, Reliability Assessment of

Computer Processed Data, and Statistical Sampling.  Makray Decl., ¶ 8.  DOL management was so impressed that they next had Ms. Makray develop training for the GS-15 Audit Directors. Makray Decl., ¶ 8.  In 2007, her vast expertise led OIG management to reassign Ms. Makray as Assistant Director/Senior Auditor for what is now OA's National Office of Talent Pool and Training.[6]  Makray Decl., ¶ 8; Exh. 9 at 14.  Of course, this position is only a GS-14, the grade Ms. Makray has been stuck at since the day she arrived in OIG.  Makray Decl., ¶ 8.

After her reassignment, Ms. Makray remained intimately involved in OIG Quality Assurance work for OAQA.  Makray Decl., ¶ 8.  Up to and including the advertisement of the OAQA Director position, she was performing quality reviews during each Congressionally-required semi-annual period; assisted with every peer review that DOL OIG performed on other federal agencies; served as a liaison to complete the applicable portions of the peer reviews that external agencies required while conducting a peer review of DOL OIG; and served as the "instrumental" player in drafting OA policies and procedures and finalizing the OA Handbook. Inspector General Act of 1978, 5 U.S.C. App. 3 § 5(a); Coyle ROI Aff. at 3; Coyle Dep. at 16-19, 30-31, 68-70, 72; Makray Decl., ¶ 8; Donovan Decl., ¶ 5; Makray Dep. at 44-45.  In fact, former OAQA Director Robert Coyle sought Ms. Makray out to assist with the peer reviews of DHS and DOT in 2009 in particular because Mr. Raponi told him that OIG "needed the best" on that assignment and that Ms. Makray was "the best they have." Coyle Dep. at 19; Makray Dep. at 189. According to Mr. Coyle, she "did an exceptional job."  Coyle Dep. at 16-17.[7]

---

[6]     OA underwent a number of structural changes from 2007 through 2011.  Ms. Makray was first reassigned to be an Assistant Director in OPAMR; this position moved to OAO in 2010, and finally, to the Office of National Talent Pool and Training Pool in 2011.  Makray Decl., ¶ 8.  Her title and duties have remained the same throughout.  Id.

[7]     Of course, Ms. Makray's new role as a trainer is also directly relevant to Quality Assurance and would have made her an invaluable asset as OAQA Director.  Her instruction has contributed to the vast improvement DOL's Quality Assurance program.  Exh. 32 at 5.  The training courses she has developed and instructed since 2007 have emphasized Quality Assurance.  A detailed list of the courses she has instructed can be found in ¶ 8 of Ms. Makray's declaration.

Ms. Makray is widely recognized as an expert by peers and managers within OIG for continuously providing technical guidance to OA staff and has been OA staff's go-to person to answer questions and lend assistance.  Exh. 2; Donovan Decl., ¶ 8; Allen Decl., ¶¶ 4-6; Edwards Decl., ¶ 2-3, 5, 9; Gers Decl., ¶ 9; Woodford Dep. at 51.  She was also selected by a body above the Office of Audit to attend Georgetown University and pursue a Master's degree in Public Policy in recognition of her potential as a future leader in OIG.  Makray Decl., ¶ 10.

### Ms. Makray's Extensive Prior Experience In QA And As An Auditor

Ms. Makray gained experience in Quality Assurance and served in leadership positions long before she joined DOL.  In fact, she has more than twenty years of QA, leadership, and supervisory managerial experience.  Exh. 1 at 1-5. This began during her military career, where she served fifteen years as an Officer before retiring as a Major in 2004.  Makray Decl., ¶ 7-9; Exh. 1.  Ms. Makray's career as an auditor began in 1991 with the Maryland National Guard, where she performed quality reviews in addition to an array of audits in accordance with the Generally Accepted Auditing Standards.  Exh. 1; Makray Dep. at 11-12, 14-16; Makray Decl., ¶ 7.  She supervised two subordinates and acted as Chief of Internal Review in the division chief's absence.  Exh. 1 at 4; Makray Dep. at 11-12, 14-16; Makray Decl., ¶ 7.   Ms. Makray next spent two years as a Senior Auditor at the Small Business Administration's ("SBA") OIG Credit Programs Group, where she served as program manager, oversaw a subordinate, acted as the lead auditor, reviewed lower-graded auditors' work, and conducted and reviewed audits of all types. Exh. 1 at 4; Makray Dep. at 16-17; Makray Decl., ¶ 7.  Although the SBA OIG did not yet have a Quality Assurance office, she helped to vastly improve their quality review process by developing and implementing a quality review checklist, along with a training seminar related to Quality Assurance.  Exh. 1 at 4; Makray Decl., ¶ 7.

In 2002, Ms. Makray joined the Department of Treasury's Inspector General Auditor Training Institute ("IGATI"). Exh. 1 at 3; Makray Decl., ¶ 7. There, she was responsible for developing, modifying, and instructing auditing courses and overseeing course curriculum. Exh. 1 at 3; Makray Dep. at 20; Makray Decl., ¶ 7. Many of the courses she instructed emphasized GAGAS, the Generally Accepted Auditing Standards, and Quality Assurance components. Makray Decl., ¶ 7. In nearly four years, she instructed seventeen different auditing courses to over 2500 federal IG and auditing personnel, including a number of agency-specific courses. Exh. 1 at 3; Makray Dep. at 20; Makray Decl., ¶ 7. Her superb communication and leadership skills were readily apparent: she received the highest evaluations of all IGATI staff with an overall evaluation score of at least 4.77 out of 5 each year. Exh. 1 at 3; Makray Decl., ¶ 7.

### The Requirements of the OAQA Director Position

Defendant suggests that technical expertise in the field of Quality Assurance was not relevant to the position's requirements and that agency management placed much more value on leadership experience. Def. Mot. at 16, 20. Even if that were true, it would be fatal to summary judgment: Mr. Reid received only middling ratings in leadership, while Ms. Makray was rated as "Exceeds," the very highest category. Exh. 2 at 30-31, 45; Exh. 10 at 4, 21.

Contrary to defendant's assertion, organic HR personnel documents for the OAQA Director position show that its major duties required a deep understanding of auditing standards, policies, and procedures because the OAQA Director is responsible for establishing OA's quality control system, policies, and procedures. Exh. 15 at 2. The Position Description establishes that the OAQA Director "is responsible for directing, planning, organizing, and managing the work of the OAQA" and establishing and maintaining a Quality Assurance program for the entire office.

Exh. 15 at 1.[8]  The OAQA Director must not only have in-depth technical expertise, he or she must have the communication skills necessary to convey that technical expertise and "provide guidance to audit and peer review teams," interpret auditing standards and policies and translate those requirements into OIG-wide policies, and provide "technical guidance and advice" at OA Manager's Meetings.  Exh. 15 at 2; Exh. 16 at 2; Donovan Decl., ¶ 7.

### Mr. Reid and Ms. Makray's Comparative Credentials for the OAQA Director Position

Ms. Makray had significantly more Quality Assurance experience than Mr. Reid, and had been graded as a GS-14 for nearly four years longer than he; in fact, Mr. Reid just barely met the requisite one year time in grade.  Exh. 1 at 1-2; Reid Dep. at 9; Coyle Dep. 37.  Mr. Reid's experience conducting Quality Assurance reviews was marginal at best, and the selecting official and head interview panelist, Deputy AIGA Raponi, knew this.  In fact, Mr. Reid did not even include his DOL OIG OAQA experience on his resume, and with good reason.  Exh. 3.

Mr. Reid spent approximately half of his first year at DOL OIG working for another division and not performing any QA duties.  Coyle Dep. at 74-75.  As Mr. Reid's reviewing official Mr. Raponi knew this and more:  Mr. Reid was not even rated in two of his position's performance standards in his FY 2009 and FY 2010 appraisals because he did perform any QA duties related to those standards.  Exh. 10.  Mr. Reid himself is not even sure of how many quality reviews he performed at DOL before applying to become Director.  Reid Dep. at 26.  The Quality Assurance

---

[8]     Among the major duties of the position, the OAQA Director "establishes a system of quality control" that provides OA with assurance that the office of audit "compl[ies] with professional standards and applicable legal and regulatory requirements" and "encompasses the audit organization's leadership, emphasis on performing high quality work, and the organization's policies and procedures"; "ensure[s] compliance with OA's quality control policies and procedures" and "[d]evelops and establishes" various OA policies and procedures.  Exh. 15 at 2; Exh. 16 at 2.

work that Mr. Reid did perform, was not performed well:  his supervisor, former OAQA Director Coyle, admitted that he was "disappointed" in it. [9]  Coyle Dep. at 38-39; <u>see</u> Donovan Decl., ¶ 9.

Not only did Ms. Makray spend more time in OAQA than Mr. Reid, she had significantly more experience in QA both prior to and at DOL.  She joined DOL with more than fifteen years of Quality Assurance experience.  Makray Decl., ¶ 7-9, 15.  At DOL, in addition to her time as a member of OAQA, she continued performing Quality Assurance duties after her departure from the division because management recognized her as "the best" they had.  Coyle Dep. at 16-19.  Her additional role of conducting training was also very much relevant to QA work because it involved teaching auditing standards.  Makray Decl., ¶ 8; Exh. 1 at 1.  And in fact, according to senior OIG management, she "is well recognized as a national expert on some of the key issues that face the inspector general community."  Woodford Dep. at 50; Donovan Decl., ¶¶ 6, 8.  Thus, DOL's claim that she had been away from QA at the time of the interview is patently untrue.

Ironically, judging by the standards that defendant wishes to apply to Ms. Makray's experience, Mr. Reid had virtually no QA experience.  He had 20 years of general experience as an auditor at the Department of Veterans' Affairs before coming to DOL, but not in Quality Assurance.  VA OIG did not have an office dedicated full-time to quality assurance until shortly before his departure, and he admitted he had only performed Quality Assurance duties there for about five years.  Reid Dep. at 14; Raponi Dep. at 87; Makray Dep. at 177-78; Gers Decl., ¶ 3; Exh. 17 at 22; Exh. 18 at 20.  The quality reviews that he did perform mainly consisted of Independent Referencing Reviews, which involve nowhere near the amount of in-depth knowledge of quality control reviews.  Gers. Decl., ¶¶ 3-4.  The senior auditors that performed such reviews

---

[9]    On more than one occasion, Mr. Reid mistakenly issued more than one audit report under the same control number or issued the same audit report twice. Coyle Dep. at 38-40.  As to Mr. Reid's abilities in reviewing performance audits, Mr. Coyle stated that he was merely "average."  Coyle Dep. at 42.

did not do so full time because they were also responsible for conducting audits. Gers Decl., ¶ 3. While Mr. Reid claims that he did "a hundred plus" of such reviews at VA, a former Audit Manager from VA has estimated that be likely performed only two or three per year. Gers Decl., ¶ 4. Ms. Makray, on the other hand, continuously performed Quality Assurance work alongside her auditing duties in every auditing position she had held with the federal government, beginning with the National Guard in the early 1990's. Exh. 1; Makray Decl., ¶¶ 7-9, 15.

Mr. Reid did not have any leadership experience that would have compensated for his lackluster QA background. His resume does not reflect any supervisory experience – not even his few weeks as acting QA Director. Exh. 3. There is no evidence that outside of that brief experience he had ever led a team or overseen subordinates. Exh. 3; Exh. 24. His performance appraisal immediately before the selection process rated him as merely a "meets" in his leadership abilities. Exh. 10 at 2-3, 18, 20. According to senior DOL management, Mr. Reid is also not a strong communicator. Coyle Dep. at 54. He was and still is unable to "verbalize things well," and his former manager has described his interpersonal skills as "poor." Coyle Dep. at 54, 60; see also Woodford Dep. at 104.[10]

Mr. Reid's post-selection performance as OAQA Director has been truly abysmal. One major aspect of his position is to conduct Continued Professional Education ("CPE") training courses regarding the OAQA process. Woodford Dep. at 98-99, 130-31. The evaluations of Mr. Reid for the courses he instructed reflected that he could not successfully answer the attendants' questions, lacked knowledge of the OAQA process, was not prepared or organized, and could not present information clearly. Exh. 19. His evaluations were among "the poorest" that the OIG

---

[10]     In fact, when Mr. Reid initially interviewed to join DOL in 2009, Mr. Coyle's observation of him as a panel member was that he was a "poor communicator" that did not perform well in his interview. Coyle Dep. at 64.

Training Director could remember ever receiving for someone who was not fired.  Woodford Dep. at 117.  OA senior management has continued to criticize Mr. Reid's work and lack of knowledge. Woodford Dep. at 138; Donovan Decl., ¶ 12; Edwards Decl., ¶ 9; Allen Decl., ¶¶ 2-4.  At least one Audit Director does not have Mr. Reid review his staff's work because he needs "someone far more knowledgeable."  Donovan Decl., ¶ 12.

Ms. Makray, by contrast, has served in a leadership role in every auditor position she has encumbered, and has been rated and described by agency management as an excellent communicator.  Exh. 1 at 1-5; Makray Decl., ¶¶ 7-9, 15; Coyle Dep. at 32-33; Woodford Dep. at 49-50, 202-03; Warren Dep. at 22-30.  By the admission of defendant's senior management, she is and always has been the person that audit staff goes to with questions or for guidance because of her expertise, approachability, and ability to convey complex technical concepts. Woodford Dep. at 51; Donovan Decl., ¶ 8; Allen Decl., ¶¶ 4-6; Edwards Decl., ¶ 2-3, 5, 9.

## The Creation of the OAQA Director Vacancy

When the OAQA position became vacant in November of 2010, Deputy AIGA Raponi solicited Mr. Reid to fill the position on an acting basis, active November 22.  Lewis Dep. at 27; Reid Dep. at 27.   However, Mr. Reid's service as Acting Director did nothing to improve his credentials in any meaningful way:  he served in this position during OA's slowest time of year, which overlapped with the Thanksgiving, Christmas, and New Year holidays and when only one of the year's 67 reports were issued.  Raponi Dep. at 25; Makray Decl., ¶ 15; Exh. 20.  Mr. Raponi cannot name anything specific that Mr. Reid accomplished during that time and, despite Mr. Raponi's claim to the contrary, there is nothing on the DOL OIG website that suggests that he accomplished much of anything while acting OAQA Director.  Raponi Dep. at 23, 25-26; Exh. 20.

**The HR Screening and Interview Panel Processes Do Not Validate Mr. Reid's Selection**

The preceding Sections demonstrate that Ms. Makray was superbly qualified to be OAQA Director and that Mr. Reid was not a fit candidate. Defendant nonetheless contends that Mr. Reid's selection was the product of a thorough review of his qualifications by OIG HR and a rigorous interview panel process. Def. Mot. at Def. Mot. at 9, 16. Nothing could be further from the truth.

HR did not screen applicant materials. Had it done so, it would never have referred either of the two male candidates, Mr. Reid and Mr. Lemke, to the interview panel. Mr. Reid's resume was out of date, made no mention of his supposed decisive service as acting OAQA Director, or for that matter his required one year of time in grade or any time at DOL OIG. Exh. 3. HR scored Mr. Lemke last among all of the applicants. Exh. 21.

The panel score sheets do not reflect their actual evaluations of candidates. One of the three panelists contemporaneously admitted to an OIG Audit Manager that Ms. Makray "clearly interviewed the best of all the candidates," and he admitted on deposition to having no explanation why he went back and lowered three of her four interview scores. Dixon Dep. at 60-64. A second panelist admitted that he never saw composite panel scores and owned up to having destroying his interview notes in violation of 29 C.F.R. § 1602.14; 5 C.F.R. § 335.103; and IG Directive 3-335 at 23 (Exh. 33). Yarbrough Dep. at 70-71. The third panelist, Mr. Raponi, had no recollection of the substance of the interviews. Raponi Dep. 63-64, 79. Therefore, just as a comparison of Ms. Makray and Mr. Reid's technical expertise and leadership abilities disproves defendant's supposed evaluation of their qualifications, the HR and panel process as actually conducted provides no support for passing over Ms. Makray.

<u>The Human Resources Screening Process</u>

Defendant suggests that its Human Resources Specialists "independently determined" the candidates' qualifications for the OAQA Director position.  Def. Mot. at 9, 16.  However, the record shows that there was not any meaningful screening process here: the HR department's determination of "qualified" candidates was based solely on the each applicant's unverified self-assessment.   The role HR was supposed to have played was to score the applicants based on their self-assessments only after ensuring that their responses were substantiated by required documentation, which consisted of a resume, an SF-50 showing current time in grade, and the applicant's most recent performance appraisal.  Cropper Dep. at 53-56, 60, 63; Exh. 16 at 4; Exh 31 at 2-3, 708.

A total of seventeen applicants applied for the position.  Exh. 21.  Of those seventeen, the three that were internal to DOL OIG – Ms.  Makray, Melvin Reid, and Mark Lemke – were referred to the panel.  Exh. 21; Makray Decl., ¶ 11.  Mr. Lemke was never really in contention.  He did not even meet OIG's standard cut-off score of 90 points; Ms. Cropper lowered it so that he could be added to the "best qualified" list.  Exh. 21; Cropper Dep. at 104, 110; Raponi Dep. at 72; Exh. 7; Exh. 31 at 7-8.

Mr. Reid failed to even include any of his one year's experience in DOL OIG – his only time as a GS-14 on his resume.  Exh. 3 at 1.  He also failed to submit an official HR form required to apply.  Exh. 22; Exh. 23; Lacey Dep. 28-29.   His resume and self-assessment contained information that he admitted on deposition was <u>not even true</u>:  he does <u>not</u> have a Master's Degree in Accounting and is <u>not</u> a Certified Internal Auditor or Certified Fraud Examiner.  Exh. 24 at 3; Exh. 3 at 2; Reid Dep. at 30, 34-35.  Despite all this, he somehow made it through HR's supposedly objective screening process. Exh. 3.  If the applicants' information was verified, Mr. Reid could

not possibly have been referred to the interview panel.  But the flawed screening process does not excuse defendant from its discriminatory selection of Mr. Reid because Mr. Raponi had knowledge of all of the discrepancies on and shortcomings of Mr. Reid's application materials.[11]

The Interview Panel

The interview panel that Mr. Raponi put together could not have reached a fully informed, genuinely unbiased, decision on the selection of Mr. Reid.  Deputy AIGA Raponi was the head of the panel and chose Michael Yarbrough, the Audit Director of the Atlanta Field Office, and Tony Dixon, the Director of the Program Fraud Division of DOL OIG's Office of Investigations to participate.  Raponi Dep. at 54-55; Raponi ROI Aff. at 3; Yarbrough ROI Aff. at 3; Dixon ROI Aff. at 2.[12]  Despite defendant's claim that all of the panelists scrutinized candidates' applications, Mr. Yarbrough admitted that he did not recall receiving or reviewing the candidates' applications, and did not know about any of the candidates' performance or accomplishments, prior to conducting the interviews.  Compare Def. Mot. at 5 with Yarbrough Dep. at 43, 54-55.  He was not even present for the interviews and only participated via telephone.  Yarbrough Dep. at 40; Yarbrough ROI Aff. at 3. There is no way of being sure about Mr. Yarbrough's contemporaneous impressions of any of the candidates' interviews because he threw away his interview notes in violation of 29 C.F.R. § 1602.14; 5 C.F.R. § 335.103; and IG Directive 3-335 at 23 (Exh. 33).  Yarbrough Dep. at 70.

Mr. Dixon is not an auditor, has never in his career served as an auditor, and does not have any sort of degree or certification in auditing or accounting.  Dixon Dep. at 13-14.  He has no

---

[11]     Not only was Mr. Raponi the rating official for Mr. Reid's two performance appraisals with DOL, he also worked with Mr. Reid at VA.  Exh. 10; Raponi Dep. at 89. And though he credited Mr. Reid for having a Master's Degree in Accounting, he admitted on deposition that he did not even know what that degree was.  Raponi Dep. at 31.
[12]     Mr. Yarbrough has told a fellow senior OA manager that he had to do what Mr. Raponi told him to when making selection decisions.  Woodford Dep. at 31-32.

expert knowledge of how GAGAS are applied and is unfamiliar with OMB guidelines for auditing. Dixon Dep. at 50-52.  He has admitted that his "familiarity with Quality Assurance reviews is limited, at best." Dixon Dep. at 53.  While he recalls receiving the candidates' applications before the interviews via email, he does not remember whether any other information accompanied them, and does not recall the contents of anyone's application packages. Dixon Dep. at 33.  He later admitted to colleagues that Ms. Makray performed better than the other two interview candidates. Allen Decl., ¶ 7; Edwards Decl., ¶ 8.

The Interview and Selection Process

Aka and Hamilton both speak to the unreliability of subjective explanations of an employers' selection decisions.  156 F.3d at 1298; 666 F.3d at 1357.  Defendant relies heavily on the interview process to justify its selection of Mr. Reid.  Def. Mot. at 2, 9, 14, 18.  Richard Woodford, the Executive Assistant to Deputy AIGA Raponi and AIGA Lewis, designed the interview questions, as he had done many times before, to elicit five to ten minute responses to each question.[13]  Woodford Dep. at 16; Exh. 25.  Interviews were designed to last at least thirty minutes in order to afford the panelists ample opportunity to evaluate the candidates' responses and make a valid assessment of their performance and qualifications for the position.  Woodford Dep. at 17-18, 43.  Nonetheless, all three interviews together lasted less than an hour.  Exh. 8 at 1-3; Woodford Dep. at 40-42; Makray Decl., ¶ 12.

---

[13]     As the executive assistant, Mr. Woodford was actively involved in preparing an interview panel during the selection process of upper-level positions within OIG.  Woodford Dep. at 22-26.  In addition to drafting interview questions, he would usually be tasked with coordinating the interview panels and selecting who would serve on them, ensure that the panelists received the candidates' application materials ahead of the interviews, and coordinate with HR to brief the panelists.  Woodford Dep. at 20-21.   Mr. Raponi did not have him involved in any of this here. Woodford Dep. at 20-21.

None of the panelists have any specific recollection of what any of the candidates discussed during the interviews.  Raponi Dep. at 63-64; Yarbrough Dep. at 48; Dixon Dep. at 37-38, 43.  However, Mr. Dixon and Mr. Yarbrough do both admit that Ms. Makray performed well.  Dixon ROI Aff. at 3; Dixon Dep. at 45-46; Yarbrough Dep. at 62.  Mr. Raponi alone claimed that Ms. Makray "did not" "handle" herself well.  Raponi Dep. at 63-64.

Ms. Makray has a very specific recollection of outlining the important elements of auditing standards, the steps she would take to ensure compliance to those standards, her extensive leadership experience and how she would apply that experience to hold her staff accountable, and her organizational, communication, and leadership skills.[14]  Makray Decl., ¶ 11.  Mr. Reid claims that he spent more than an hour discussing his supposed work at OAQA and his experience as acting director.  Reid Dep. at 40-41.  But on deposition, he could not elaborate and was unable to identify even a single achievement he accomplished as acting director <u>or</u> during his time at OAQA.  Reid Dep. at 15, 26, 28.  He also included information in his interview that Mr. Raponi knew was untrue, including an exaggeration of the extent of his Quality Assurance experience and the importance of his service as acting director.  Raponi ROI Aff. at 4-5; Reid Dep. at 40-41.

The panelists' interview notes and scores do little to justify defendant's selection of Mr. Reid over Ms. Makray.  Each panelist purportedly took notes as the interviews went along of what they thought was important and scored each applicant's answers on a scale of zero through five.  Dixon Dep. at 73-74; Yarbrough Dep. at 51-52; Raponi Dep. at 65-68.  At the end of the interviews, the panel then supposedly provided each other with their scores for each of the candidates' individual answers.  Yarbrough Dep. at 48-49; Raponi Dep. at 118; Yarbrough ROI Aff. at 2.  Mr.

---

[14]      Ms. Makray's assessment of her own interview performance may suffice, on its own, to surmount summary judgment.  <u>See</u> <u>Aka</u>, 156 F.3d at 1295-97; <u>cf.</u> <u>Haynes v. Williams</u>, 392 F.3d 478, 482 (D.C. Cir. 2004) (A "plaintiff's personal testimony cannot be inadequate to raise a genuine issue regarding his own experience." (internal quotation marks omitted)).

Raponi claims to have authored the scoring sheet, which reflected that Mr. Reid received a total score of 14 points from the interviews, while Mr. Lemke and Ms. Makray each received 12 points. Exh. 8 at 4; Raponi Dep. at 83.

According to Mr. Raponi, all of the panelists' scores were within one point of each other for each candidates' response to each question, so no discussion was necessary for any of the questions.[15]  Raponi Dep. at 85-86; Yarbrough ROI Aff. at 2.  Yet Mr. Dixon's interview notes reflect that he changed his scoring of Mr. Reid's and Ms. Makray's answers – raising Mr. Reid's scores and lowering Ms. Makray's scores –  to one or more question at some point in the interview process.  Exh. 8 at 7-10; Dixon Dep. at 63-64; 71; Edwards Decl., ¶ 8.  He has no explanation as to why.  Dixon Dep. at 63-64.  Mr. Yarbrough did not retain his notes, so there is no record of his original or final score of any of the candidates.  Yarbrough Dep. at 70.

Mr. Raponi claimed that the panel considered the candidates' applications, "along with their responses to the questions asked during the interviews," in reaching their final decision. Raponi ROI Aff. at 4.   He claimed that the selection was based on the results of the interview panel, the candidates' education, and their supposed "directly related experience" working in a Quality Assurance office.  Raponi ROI Aff. at 4-5.  However, Mr. Raponi later admitted that he did not know what Mr. Reid's supposed higher education – a Master's Degree in Accounting – even was, and Mr. Reid has since admitted that he has no such degree.  Raponi Dep. at 31; Reid Dep. at 18.  And Mr. Raponi knew that Ms. Makray had far more experience performing Quality Assurance work than Mr. Reid. Exh. 2; Exh. 10; Coyle Dep. at 74-75; Raponi Dep. at 89.

---

[15]    He claimed the panel would only have a discussion about the candidates' responses to any particular question if there was more than a one-point discrepancy between any of the panelists scores; if they were all within one point of each other on an answer, then the candidate would receive whatever score two of the three panelists gave them as their final score.  Raponi Dep. at 118; Yarbrough ROI Aff. at 2.

Though he cannot recall any specifics from the interview and has no notes to verify his impressions, Mr. Yarbrough placed a lot of weight on the candidates' performance at the interviews to support Mr. Reid's selection.   Yarbrough Aff. at 4.   With his extremely limited understanding of auditing and Quality Assurance, Mr. Dixon mainly based his decision to support Mr. Reid's selection on the fact that Mr. Reid had been acting in the OAQA Director position at the time and on his "understanding," none of which is true, that Ms. Makray "had been away from the type of auditing that the position focused on."   Dixon ROI Aff. at 3.   He could only have reached this "understanding" from knowledge that Mr. Raponi imparted on him, because Ms. Makray certainly did continue to be involved in QA work and discussed that fact at length in her interview.   Makray Decl., ¶¶ 7-9, 11; Makray Dep. at 213.   Nonetheless, the panel somehow reached the decision to select Mr. Reid.

### DOL Management, Including One Panelist, Admitted *Post Hoc* that Ms. Makray Was More Qualified than Mr. Reid

Mr. Woodford, the Director of the Office of National Talent Pool and Training, has supervised Ms. Makray directly and has observed Mr. Reid's performance both before and after his selection on many occasions.   Woodford Dep. at 117-23, 130-32, 140, 201-02.   Basing his opinion on application materials, his "personal observation," Mr. Reid and Ms. Makray's "experience, time and grade," and "performance, both on the job and in the instruction environment," he admitted that Mr. Reid was "nowhere near as qualified as Ms. Makray" for the position.   Woodford Dep. at 201-02.

The former OAQA Director and now current OAO Director Robert Coyle admitted on deposition that Ms. Makray was a stronger candidate for the OAQA position than Mr. Reid.   Coyle

Dep. at 57-59, 90.[16]   Though not involved in the selection process for the position, Mr. Coyle is the only member of OIG management that had occasion to directly supervise both candidates and attest to their comparative abilities.   Coyle Dep. at 9, 36.   He also has first-hand knowledge of the experience and abilities required for the OAQA Director position because he formerly held that position.   Coyle Dep. at 8-9.

After Mr. Reid's selection, even one panel member stated to two OIG officials that he felt that Ms. Makray was in fact more qualified for the OAQA Director position than Mr. Reid.   Mr. Dixon indicated to Alvin Edwards, a former Audit Director for DOL OA, that Ms. Makray had interviewed the best, answered the questions very well, and appeared to him to be the most qualified for the position, and that that he initially rated Ms. Makray higher than Mr. Reid during the interview but later lowered her scores.   Edwards Decl., ¶ 8.   Mr. Dixon stated to an Assistant Director, Christine Allen, that Ms. Makray was the best candidate for the position.   Allen Decl., ¶ 7.   He even owned up on deposition that he did not think that Ms. Makray was any less qualified for the position than Mr. Reid.   Dixon Dep. at 77-78.

### DOL OIG's History of Discriminatory Treatment of Ms. Makray

Defendant discriminated against Ms. Makray a number of times before her non-selection for the OAQA Director position.   In fact, this was as at least the fourth time that it passed Ms. Makray over or blocked her from the opportunity to compete for a promotion that she was significantly qualified for.   Makray Decl., ¶ 16.   In April of 2008, the position for the Director OPAMR (GS-15) was advertised under Vacancy Announcement No. OIG-2008-025-OA-MSD.

---

[16]      Mr. Coyle held Mr. Lemke in a higher regard than he deserved:  Mr. Lemke scored the lowest on the self-assessment of all the OAQA Director applicants.  Coyle Dep. at 57-59, 90; Exh. 21.

Exh. 4.[17]   Ms. Makray timely applied for the position and was selected to be interviewed for it along with three other candidates: one internal female, Mary Lou Casazza; an internal male, David Sterling, who had been serving in the position on an acting basis; and one external male.  Makray Decl., ¶ 16; Makray Dep. at 195-96.  Mr. Sterling withdrew his application before the interviews were conducted.  Makray Decl. ¶ 16; Makray Dep. at 196; Exh. 6.  Both women interviewed for the position, but neither was selected for it.  Makray Decl., ¶ 16; Makray Dep. at 196.  No one was. Instead, Mr. Raponi elected to have Mr. Sterling continue to serve in it on an acting basis for <u>two years</u> until he was promoted to Executive Assistant and the division was abolished.  Makray Decl., ¶ 16; Makray Dep. at 196.

A year later, defendant once again foreclosed Ms. Makray from a promotional opportunity. In late 2009, Ms. Makray proposed to Mr. Raponi the creation a position that would oversee training and policy in the Office of Audit.  Makray Decl., ¶ 16.  Not long after, Mr. Raponi had Ms. Makray tasked with creating a list of duties for such a position, along with a subordinate one. Makray Decl., ¶ 16; Exh. 29; Makray Dep. at 52.  Mr. Raponi accepted Ms. Makray's suggestion, but – despite the fact that Ms. Makray was the recognized expert in all of the duties related to the position – laterally reassigned a male into it.  Makray Decl., ¶ 16; Makray Dep. at 52-53, 56-57. Ms. Makray was understandably disappointed that she was not given the opportunity to fill this position and soon after approached Mr. Raponi and Mr. Lewis to discuss what future plans, if any, they had for her.  Makray Decl., ¶ 16; Makray Dep. at 54-55.  Mr. Raponi became visibly angry with her, and candidly stated that they had none.  Makray Decl., ¶ 16.

---

[17]   This position had been filled by Janine Wagner-Sandoval, who was just one of a number of women who departed DOL OIG shortly after Mr. Raponi came on board because they had felt that he treated them unfairly because of their sex.  Woodford Dep. at 77-78; 127-28; 184-85; Makray Decl., ¶ 17.

In November of 2010, defendant again barred Ms. Makray from the opportunity to apply for a promotion by direct-reassigning Mr. Coyle into the Director of Operations position, rather than opening it up to competition.  Makray Decl., ¶ 16.  That reassignment, of course, created the OAQA Director vacancy that is the subject of this litigation.

Defendant's mistreatment of Ms. Makray is by no means limited to circumstances of non-promotion.  In 2009, Mr. Raponi instructed Ms. Makray's supervisor, David Sterling, to lower her performance appraisal in one element from "exceeds" to "meets," which lowered her overall performance rating from "exemplary" to "highly effective." Makray Decl., ¶ 16; Exh. 2 at 28.  In 2011, Mr. Raponi had Mr. Coyle lower her appraisal from "exemplary" to "highly effective" and recommend her for a lower bonus.[18]  Makray Decl., ¶ 16; Exh. 2 at 52.   Simply put, defendant discriminated against Ms. Makray at every opportunity.

## DOL OIG's History of Discriminatory Treatment of Other Women

Ms. Makray is certainly not the only female who faced discrimination based on her sex in DOL OIG's Office of Audit.  The fact of the matter is, OA has a lengthy history of disparate treatment of women.[19]  One such woman was Barbara Warren, a top performer who elected to retire early rather than continue to face Mr. Raponi's discriminatory treatment of her.  Ms. Warren joined the Department of Labor as a GS-15 Audit Director in February of 2007.  Warren Dep. at 10-11.  Prior to joining DOL, Ms. Warren had more than eight years of experience as a supervisory auditor with the federal government, and twenty-three years total as an auditor.  Warren Dep. at

---

[18]    After Mr. Raponi left DOL, Mr. Woodford, her new supervisor and Mr. Galayda, the acting DAIGA, raised her appraisal back to "exemplary."  Makray Decl., ¶ 16.

[19]    In its Motion, defendant attempts to mischaracterize Ms. Makray's deposition testimony by claiming that she said Mr. Raponi went after women, not because they were women, but because they stood up to him.  Def. Mot. at 24.  What Ms. Makray's testimony really states is that, in addition, to her being aware of Mr. Raponi making derogatory remarks about women and of him treating a number of women disparately, he also went after both men and women who stood up to him, but especially targeted women who did so.  Makray Dep. at 203-05.  In fact, in her testimony, she identified a number of specific women who were the targets of Mr. Raponi's discrimination.  Makray Dep. at 233-37.

11-12.  Throughout her career, she had received timely promotions, was "frequently recognized" for her "technical writing abilities in the auditing field," and was praised for her leadership abilities and audit expertise.  Warren Dep. at 12, 15-17.  Not once in her career was she ever told by a supervisor that her leadership abilities were lacking or that she was not performing her job duties successfully – that is, until she went under the supervision Mr. Raponi.   Warren Dep. at 19-20.

When Mr. Raponi joined DOL OIG in September of 2009, he immediately interfered with Ms. Warren's authority as a supervisor.  Just before he came on board, Ms. Warren had served as the selecting official and sat on the interview panel for a GS-14 auditing position under her supervision.  Warren Dep. at 35-36, 38.  Without even consulting her, Mr. Raponi rescinded the offer to the candidate that the panel had selected.  Warren Dep. at 36-37; Woodford Dep. at 196-197.  Mr. Raponi's mistreatment of Ms. Warren did not end there.  Over the course of the next several months, he accused her of abusing her sick leave when she took time off to care for her sick husband and requested leave to schedule critical doctor appointments with a kidney specialist.  Warren Dep. at 43-44.  He also changed her rating of one of her subordinates' performance appraisals and changed the bonuses of two others without consulting her.  Warren Dep. at 46-49.

When Ms. Warren first joined DOL in 2007, she had planned on retiring as soon as she met her full 30-year mark of federal service in December of 2008.  Warren Dep. at 45-46.  By early December of 2007, she had become so distraught by Mr. Raponi's treatment of her that she contacted HR with her decision to retire on early.  Warren Dep. at 47-51, 60-61.  That same day, despite never before giving her any negative feedback, Mr. Raponi handed Ms. Warren an Unsatisfactory performance rating and placed her on a Performance Improvement Plan ("PIP").  Warren Dep. at 50, 53, 60, 79.  He did not hold any male Audit Directors to the same milestones that he claimed she failed to meet in this appraisal.  Warren Dep. at 53-55.

28

Ms. Warren would not have retired early if it were not for Mr. Raponi's treatment of her. Warren Dep. at 46, 61.  She has concluded that the only possible explanation for Mr. Raponi's mistreatment of her was that it was because she was a woman.  Warren Dep. at 66, 99-100.

At least three other women have faced similarly abhorrent treatment from Mr. Raponi.  He vastly diminished the role of the former Director of OPAMR, Janine Wagner-Sandoval, until she was left without any substantive duties before she retired.  Makray Decl., ¶ 17; Woodford Dep. at 77-78, 127-28, 184-85.  Renee Harrison-Womack's progression into management ranks was halted by Mr. Raponi, which led her to file an EEO complaint based on the Lily Ledbetter Fair Pay Act.  Ms. Harrison-Womack worked as a GS-13 in the OA Office of Audit and served as one of two team leaders for audit projects around the country; the other was a GS-14 male manager.  Edwards Decl., ¶ 10-17.  He himself described Ms. Harrison-Womack as the workhorse of their office who performed the same audit work as he did and as much of it if not more, despite her lower grade.  Edwards Decl., ¶¶ 10-17.  Yet another GS-13 auditor who had been working on a developmental assignment as an audit manager left the agency after Mr. Raponi continuously interfered with her ability to succeed at DOL, forced her supervisor to lower her performance appraisals, and failed to select her for any of the three promotions that she applied for.  Exh. 30.[20]

## ARGUMENT

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT MUST BE DENIED

More than twenty years ago, the Supreme Court specifically held that "once a defendant has proffered" a "nondiscriminatory explanation" for its actions as DOL has here, it "is no longer relevant" if "the plaintiff had properly made out a prima facie case."  U.S. Postal Serv. Bd. of Governors v. Aikens, 460 U.S. 711, 715 (1983).  The only question is "whether the defendant

---

[20]     Ms. Makray has identified other women who have suffered discriminatory treatment as well.  Makray Decl., ¶ 17; Makray Dep. at 233-237.

intentionally discriminated against the plaintiff." Id.  Since then, the D.C. Circuit has explicitly

held that determining whether a plaintiff has set forth facts to establish a prima facie case is an

unnecessary sideshow." Brady,  520 F.3d at 494 (D.C. Cir. 2008); accord e.g., Czekalski v. Peters,

475 F.3d 360, 364 (D.C. Cir. 2007).

> Lest there be any lingering uncertainty, we state the rule clearly:  In a Title VII
> disparate-treatment suit where an employee has suffered an adverse employment
> action and an employer has asserted a legitimate, non-discriminatory reason for the
> decision, the district court need not-*and should not*-decide whether the plaintiff
> actually made out a prima facie case under *McDonnell Douglas.*
>
> Rather, in considering an employer's motion for summary judgment or judgment as
> a matter of law in those circumstances, the district court must resolve one central
> question: Has the employee produced sufficient evidence for a reasonable jury to
> find that the employer's asserted non-discriminatory reason was not the actual
> reason and that the employer intentionally discriminated against the employee.

Id. (emphasis in original); accord Primas v. District of Columbia, 719 F.3d 693, 697 (D.C. Cir.

2013); Barnett v. Pa Consulting Group, 754 F.3d 354, 35 (D.C. Cir. 2013); Perry v. Donovan, 733

F. Supp. 2d 114, 118 (D.D.C. 2010) (Lamberth, C.J.).

   The Brady court specifically recounted that "[m]uch ink has been spilled regarding the

proper contours of the prima-facie-case … spawning enormous confusion and wasting litigant and

judicial resources." Brady, 520 F.3d at 494 (emphasis supplied).  Defendant has apparently pinned

its hopes on "confusion" and "waste."  It opens by arguing that Ms. Makray must "first establish

a prima facie case by a preponderance of the evidence before proceeding with her case."  Def.

Mot. at 6.  Continuing, defendant next argues that Ms. "Makray's Prima Facie Case Does Not Give

Rise To An Inference of Discrimination," and then that she only "is able to make out a nominal

prima facie case," as though there were a sub-set of prima facie cases excluded from Brady's

specific instruction.  Compare Def. Mot. at 7 with Brady, 520 F.3d at 494.

Sure proof that defendant's dispositive motion is just an out-dated cut and paste job can be found in its "Conclusion." There, defendant argues that it "is entitled to judgment as a matter of law" because Ms. Makray was not "discriminated against when DOL cancelled the <u>Finance Division</u> OAQA vacancy announcement and <u>laterally reassigned</u> Mr. Reid." Def. Mot. at 28. (emphasis added). Before then, defendant spends time disputing Ms. Makray's <u>prima facie</u> "race discrimination case." Both Counts in the Complaint sound only in sex discrimination. <u>Compare</u> Def. Mot. at 10 <u>with</u> Cplt. [ECF #1] at 10, 12.

Before <u>Aiken</u> and <u>Brady</u>, cases were formerly adjudicated under the tri-partite burden-shifting framework articulated in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802 (1973). Under it, a plaintiff established a <u>prima facie</u> case by demonstrating that he or she is a member of a protected class who sustained an actionable change in employment under circumstances which "give[] rise to an inference of discrimination." <u>Stella v. Mineta</u>, 284 F.3d 135, 145 (D.C. Cir. 2002). Once that "not onerous" burden was met, an employer was required to produce evidence of a "legitimate, nondiscriminatory reason" for its actions. <u>Texas Dept. of Community Affairs v. Burdine</u>, 450 U.S. 248, 253, 255 (1981). If it did, "'the <u>McDonnell Douglas</u> framework – with its presumptions and burdens – disappear[s].'" <u>Lathram v. Snow</u>, 336 F.3d 1085, 1089 (D.C. Cir. 2003) (quoting <u>Reeves v. Sanderson Plumbing Products, Inc.</u>, 530 U.S. 133, 142-43 (2000)).

<u>Aikens</u> and <u>Brady</u> collapsed the entire focus on summary judgment in cases like this one, where an employer offers a factual defense on the merits and there is no dispute about whether the plaintiff suffered an actionable change in employment.[21] The one and only inquiry is whether the

---

[21] The only inquiry to be addressed before the merits of defendant's factual explanation for its actions are reached is a legal one: specifically, "whether the alleged act[] of discrimination constitute[s] adverse employment action[]." <u>Perry v. Donovan</u>, 733 F. Supp. 2d at 118. In other words, does the challenged action have "materially adverse consequences affecting the terms, conditions, or privileges of employment." <u>Forkkio v. Powell</u>, 306 F.3d 1127, 1131 (D.C. Cir. 2002). There is no doubt that Plaintiff met this legal standard. Denial of a promotion is an adverse employment action. <u>Brown v. Brody</u> 199 F.3d 446, 456 (D.C. Cir. 1999).

"employee's evidence creates a material dispute on the ultimate issue of [discrimination] either directly by [showing] that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.'" <u>Jones v. Bernanke</u>, 557 F.3d 670, 679 (D.C. Cir. 2009). "At this point, to survive summary judgment," all that a "plaintiff must show" is that "a reasonable jury <u>could</u> conclude from all of the evidence that the adverse employment decision was made for a discriminatory reason." <u>Lathram</u>, 336 F.3d at 1088 (emphasis supplied) (citing <u>Aka</u>, 156 F.3d at 1290); <u>see</u> <u>also</u> <u>Hamilton</u>, 666 F.3d at 1351. Since there is no dispute that Ms. Makray suffered an adverse employment action, nothing stands between Ms. Makray and a trial on the merits because she can create a genuine issue of material fact about whether defendant discriminated against her in many ways.

## I.      Ms. Makray Has Presented Abundant Evidence From Which A Reasonable Juror Could Infer Discrimination.

The exacting standard governing summary judgment in civil cases of every nature is that it "is appropriate only if 'there is no genuine issue as to any material fact and … the moving party is entitled to a judgment as a matter of law.'" <u>Lathram</u>, 336 F.3d at 1088 (quoting Rule 56, Fed. R. Civ. P.; citing <u>Anderson v. Liberty Lobby</u>, 477 U.S. 242, 244 (1986)). This essential rule has been fine-tuned in employment cases, which are not typically predicated on direct evidence. That is why there are additional, specialized rules that apply that specify the many types of circumstantial evidence from which "a reasonable fact finder [could] infer discrimination," the only factual barrier that Ms. Makray needs to overcome summary judgment. <u>Aka</u>, 156 F.3d at 1294-95 (quoting <u>Shager v. Upjohn Co.</u>, 913 F.2d 398, 401 (7th Cir. 1990)). They create many genuine issues of material fact about whether defendant discriminated against Ms. Makray on account of her sex.

One way, but certainly not the only way, that a plaintiff can defeat summary judgment in an employment case is through an unadorned qualifications attack. This type of attack relies <u>exclusively</u> on the marked superiority of a plaintiff's qualifications to create a genuine issue of material fact about whether an employer discriminated. <u>Aka</u>, 156 F.3d at 1294. The Supreme Court has recognized that with nothing more, a "factfinder may infer discrimination if 'a reasonable employer would have found the plaintiff to be significantly better qualified for the job'" <u>Ash v. Tysons Food, Inc.</u>, 546 U.S. 454, 458 (2006) (citing <u>Aka</u>, 156 F.3d at 1294). "Under such circumstances, a grant of summary judgment in favor of the employer is unwarranted." <u>Calhoun v. Johnson</u>, 632 F.3d 1259, 1263 (D.C. Cir. 2011) (citing <u>Aka, 156 F.3d at 1299</u>).

Of course, a "plaintiff attacking a qualifications-based explanation is expressly <u>not</u> limited to comparing her qualifications against those of the successful applicant … she can also avoid summary judgment by presenting other evidence, direct or circumstantial, that permits an inference of discrimination." <u>Holcomb</u>, 433 F.3d at 899 (emphasis in original) (citing <u>Aka</u>, 156 F.3d at 1295). Such evidence can include: "flaws in the employer's explanation," including that the employer "misstates the candidates' qualifications" or "contradicts other contemporaneous accounts of the [its] decision" or shifts its accounts in litigation; that it relies on "heavily subjective considerations"; or is missing "contemporaneous documentation of the [employer's] proffered explanation." <u>Hamilton</u>, 666 F.3d at 1355 (quoting <u>Holcomb</u>, 433 F.3d at 897)); <u>Aka</u>, 156 F.3d at 1295; <u>Geleta v. Gray</u>, 645 F.3d 408, 413 (D.C. Cir. 2011). It can also include evidence of a defendant's past discriminatory treatment of either the plaintiff or other members of her protected class. <u>United Airlines</u>, 431 U.S. at 558; <u>Sprint</u>, 520 U.S. at 381. Ms. Makray can present considerable evidence of each of these types.

There is no doubt that the raw superiority of Ms. Makray's qualifications dwarfed Mr. Reid's deficient leadership skills and marginal Quality Assurance experience.  Standing alone, this gives rise to an inference of discrimination.  See Ash, 546 U.S. at 458.  Even if were that not the case, Ms. Makray's superlative credentials outshined Mr. Reid's, and combined with additional evidence of discrimination, surmounts summary judgment.  See Aka, 156 F.3d at 1295-97.

### A. By Itself, The Superiority Of Ms. Makray's Credentials Creates A Genuine Issue Of Material Fact About Defendant's Selection Of Mr. Reid.

Ms. Makray's superiority for the OAQA Director position is unimpeachable.  Defendant's decision to select Mr. Reid over Ms. Makray was not, as it suggests, a "close judgment call" between two comparably qualified candidates.  Def. Mot. at 14.  Recognizing its vulnerability to a direct qualifications attack, defendant attempts to avoid a meaningful comparison in two distinct ways.  First, it posits that the interview panel "prized practice over theory" in choosing to value Mr. Reid's supposed superior "expertise" in "actually performing and reviewing audits." Def. Mot. at 14. Second, it asserts that the panelists valued leadership experience as much, if not more, than any other experience because the position was "primarily managerial in nature."  Def. Mot. at 19-20.  Defendant's arguments both fail.

### 1.  Agency Management's Admissions

Defendant's management itself admitted that Ms. Makray was more qualified for the OAQA Director position than was Mr. Reid.  Mr. Raponi served as the rating or reviewing official for both Ms. Makray and Mr. Reid's appraisals immediately prior to the selection.  Ms. Makray received an "Exceeds" in the element of "leadership" for all three years under Mr. Raponi; Mr. Reid merely received a mediocre "meets" in leadership. Exh. 2 at 30-31, 45; Exh. 10 at 4, 21.  The FY 2010 appraisal period ended just before the competition began.  Mr. Raponi rated Ms. Makray at the "Exemplary" level; Mr. Reid one level down.  Compare Exh. 2 at 42 with Exh. 10 at 17.

Robert Coyle, the former OAQA Director is the only management official to have had directly supervised both Ms. Makray and Mr. Reid.  Coyle Dep. at 9, 36.  He admitted in his deposition that Ms. Makray was a "much stronger" candidate for the position than Mr. Reid and conceded in extensive detail that her technical expertise and her ability to communicate far exceeded Mr. Reid's. Coyle Dep. at 33-34, 38-39, 45-46, 59-60.

Another panelist, Tony Dixon, contemporaneously admitted to two senior members of OA after the interviews were conducted that Ms. Makray was the better candidate of the two and performed better at her interview than Mr. Reid.  Edwards Decl., ¶ 8; Allen Decl., ¶ 7.  He confirmed at his deposition that he had "no reason to think that [Ms. Makray] was less qualified than Mr. Reid for the job."  Dixon Dep. at 77-78.  Richard Woodford, the OIG National Talent Pool Director who supervised Ms. Makray and observed Mr. Reid's work on many occasions, also confessed at his deposition that Ms. Makray's qualifications for the position far exceeded Mr. Reid's.  Woodford Dep. at 201-02.

### 2.  Comparison of Experience:  Makray vs. Reid

Defendant's suggestion that Mr. Reid's lengthier experience in the actual performance of audits somehow overcame his lack of technical QA experience is nothing short of farcical.  Def. Mot. at 12-13.  Mr. Reid's lengthy service performing audits could not have counted for much. The former OAQA Director admitted that the quality office "did not do audit work" in OAQA, and explained that their role was to review audits.  Coyle Dep. at 45-46; Makray Dep. at 1-4; Reid Dep. at 5.  There is also no way that defendant could have concluded that Mr. Reid had more leadership experience when his sum total of such experience was as Acting Director of OAQA, which equated to six weeks excluding federal holidays.  Regardless of which qualities the

interview panel chose to value over others, it could not possibly have found Mr. Reid to be the better candidate because Ms. Makray's actual experience and expertise surpassed Mr. Reid's in every facet of the position.

| Experience as an Auditor and in Quality Assurance[22] | | |
|---|---|---|
| | Ms. Makray | Mr. Reid |
| Time-in-Grade as GS-14 | 5 years, 7 months | 1 year, 7 months |
| Time at DOL OIG | 5 years, 7 months | 1 year, 7 months |
| Time in DOL OIG OAQA Performing QA Reviews | 1 year, 4 months | 1 year, 1 month |
| Total Years Performing QA For DOL OIG | 5 years, 7 months | 1 year, 1 month |
| Quality Reviews for DOL OIG | More than 20 | Zero or unknown[23] |
| Peer Reviews at DOL OIG OAQA | 4 | 0 |
| Total Years of QA Experience | 20 years | 6 years |
| Other Relevant Experience | • Drafted and finalized Policies & Procedures for 2009 and 2011 OA Handbook<br>• Provided input for 2007 GAGAS, had 4 recommendations implemented<br>• Drafted and finalized SBA Story Conferencing Audit Policy<br>• Developed Audit Program for Planning Performance Audits | None |
| Total Years As An Auditor | 20 years | 21 years |

| Leadership Experience | | |
|---|---|---|
| 2010 Performance Rating[24] | Exemplary | Highly Effective |
| 2010 Performance Rating in "Leadership" Standard | Exceeds | Meets |
| Occasions Serving As Acting Supervisor And/Or Manager | • Acting Chief, Internal Review, US Property and Fiscal Office, Maryland National Guard<br>• Acting Director, IGATI | • Acting Director, DOL OIG OAQA, 11/22/10-1/12/11 |
| Leadership Positions Overseeing Subordinates | • Oversaw two subordinates with US Property and Fiscal Office, Maryland National Guard<br>• Oversaw one subordinate with SBA OIG | • None documented in resume or self-assessment |
| Military Leadership | • 15 years as military officer, retired with rank of Major<br>• Non-commissioned officer and Platoon Sergeant for three years | • None documented in resume or self-assessment |
| Training Courses Developed, Modified, And/Or Instructed | More than 25 | 0 |

---

[22]     All experience cited in the following two charts is derived from the candidates' resumes, VA self-assessments, affidavits, performance appraisals, and/or deposition testimony. Exhs. 1, 2, 3, 9, 10, 19, 23, 24, 32.

[23]     Mr. Reid could not even state with generality how many quality reviews he performed. Reid Dep. at 26.

[24]     Ms. Makray was rated in every performance element in her 2010 performance appraisal. Mr. Reid was not rated in two of his position's standards because he did not perform the QA duties associated with those standards. Exh. 2 at 42-51; Exh. 10 at 18-28.

Every bit of this evidence was known to DOL OIG.  Mr. Raponi worked alongside Mr. Reid at VA OIG and reviewed both Ms. Makray's and Mr. Reid's FY 2009 and FY 2010 performance appraisals.  Exh. 2; Exh. 10; Raponi Dep. at 89.

### B.  Defendant Misstated Mr. Reid's and Ms. Makray's Qualifications For the OAQA Director Position.

Another way that a plaintiff can overcome summary judgment is with a qualifications attack combined with evidence that the "employer's explanation misstates the candidates' qualifications," or "contradicts other contemporaneous accounts of [its] decision," which may "permit a jury to infer that the employer's explanation is incorrect or fabricated, and thus to infer discrimination."  Aka, 156 F.3d at 1295.  Here, defendant's claim that Mr. Reid was better qualified for the OAQA Director position is directly contradicted by Mr. Raponi's superior assessment of Ms. Makray over Mr. Reid for the two rating periods prior to the selection.  Exh. 2 at 29-30, 41-42; Exh. 10 at 1-2, 16-17.   Moreover, Ms. Makray can demonstrate that defendant not only misstated her qualifications by understating them to belittle her credentials, but that it also overstated Mr. Reid's qualifications to shore his up.

Defendant wholly downplayed Ms. Makray's qualifications for the position by suggesting that she had been away from the Quality Assurance field for a long time prior to applying for the position.  Dixon ROI Aff. at 3; Raponi ROI Aff. at 4-5.  Former OAQA Director Coyle admitted at his deposition that Ms. Makray continued to work with him on OAQA reviews and office-wide quality procedures after her duty station was changed.   Coyle Dep. at 16-17, 68-70, 72.   This included performing quality reviews, peer reviews, and even assisting in drafting the OA handbook and providing input for GAGAS.  Coyle Dep. at 16-17; Makray Decl. ¶ 8; Coyle ROI Aff. at 3; Coyle Dep. at 19, 30-31, 68-70.  In addition, her new role as a trainer was directly linked to the

work of OAQA, as many of her courses focused on improving DOL's QA system.  Makray Decl.,
¶ 8; Makray Dep. at 47.

Mr. Raponi claims that he did not impart any personal knowledge of the candidates' prior
experience to the other panel members, but that cannot be true.  Ms. Makray certainly did not state
in her interview that she was currently out of the quality field.  Makray Decl., ¶ 11.  As a matter
of fact, she spent a lengthy amount of time discussing how she had continued to be assisting OAQA
in her new position, how her role in training was deeply intertwined with the OAQA office, and
of the vast improvements to the quality process that she had contributed to in recent years.  Makray
Decl., ¶ 11.  The only way Mr. Dixon could possibly have come to any "understanding" that Ms.
Makray was out of the QA field – if he even did, given his admissions that he felt Ms. Makray was
more qualified – is if it came from Mr. Raponi himself.  Thus, Mr. Dixon could not have "honestly
believed," based on the substance of her interview responses alone, that she was less qualified than
Mr. Reid.  Def. Mot. at 22 & n.6; Makray Decl., ¶ 11.

Defendant grossly exaggerated Mr. Reid's leadership experience and the significance of
his detail as acting director of OAQA.  Raponi ROI Aff. at 4-5; Dixon ROI Aff. at 3.  Mr. Reid's
service as acting Director of OAQA began on November 22, 2010.  Exh. 35; Exh. 34 at 2; Raponi
Dep. at 25; Coyle Dep. at 9.  Excluding federal holidays, then, Mr. Reid served as acting director
for a total of six weeks prior to the interview.  Raponi Dep. at 25; Makray Decl., ¶ 15; Exh. 35;
Exh. 34 at 2.  No one, including Mr. Reid himself, could name anything specific that he
accomplished during that time.  Raponi Dep. at 23, 25-26; Reid Dep. at 15, 26, 28.  Mr. Raponi
threw a "Hail Mary pass" at his deposition by claiming that the DOL OIG website would
demonstrate Mr. Reid's accomplishments as acting director:  it showed that only <u>one</u> of the year's
67 audit reports was issued during that time.  Raponi Dep. at 23; Exh. 20 (OIG Website).

Nonetheless, defendant credited Mr. Reid's time as acting Director as managerial experience that was somehow demonstrative of his leadership abilities.  Def. Mot. at 24; Dixon ROI Aff. at 3; Raponi ROI Aff. at 4-5.  As his direct supervisor for this period, Mr. Raponi <u>knew</u> that Mr. Reid's experience as acting Director did not improve his credentials in any meaningful way, yet deliberately mischaracterized it as a substantive advantage for Mr. Reid.  Raponi Dep. at 23-26. Meanwhile, defendant disregarded Ms. Makray's abundant leadership experience.  Makray Decl., ¶ 9; Exh. 1.

Finally, defendant misrepresented the comparative length of Mr. Reid and Ms. Makray's experience in Quality Assurance, crediting Mr. Reid with QA experience when he worked for VA even before there was a QA office, but refusing to do the same for Ms. Makray's past experience. Raponi ROI Aff. at 4; Exh. 28; Gers Decl., ¶¶ 3, 4.  Defendant claimed that Ms. Makray only had one year and three months of directly related experience to the OAQA position, failing to credit <u>any</u> of Ms. Makray's extensive experience performing QA duties both prior to arriving to DOL and after departing from OAQA.  Raponi ROI Aff. at 5; Exh. 1.  But Mr. Raponi was fully aware, because he had worked for VA OIG before joining DOL, that VA did not create a dedicated QA office until a year before Mr. Reid left; until then, any Quality Assurance work that Mr. Reid did perform was <u>not</u> for a quality-specific office and was significantly less in-depth than the type of quality work performed at OAQA.   Reid Dep. at 23; Exh. 17 at 22; Exh. 18 at 20; Raponi Dep. at 87; Gers Decl., ¶ 3.  And of Mr. Reid's approximately 18 months as an OAQA employee, he spent roughly six of them working for another division where he did not perform <u>any</u> OAQA duties. Coyle Dep. at 74-75; Exh. 10 at 11-14.  Surely, if Mr. Reid's time at VA before it had a quality office counted towards his years of relevant experience, than Ms. Makray's nearly two decades of

performing quality work – at the National Guard, the SBA, IGATI, <u>and</u> DOL OIG – should not have been discounted.  Makray Decl., ¶¶ 7-9; Exh. 1 at 1-4.

### C. There Is Considerable Other Evidence That Defendant's Proffered Non-Discriminatory Explanation is False.

A key D.C. Circuit decision, <u>Hamilton v. Geithner</u>, provides firm grounds for denying summary judgment.  In <u>Hamilton</u>, the D.C. Circuit afforded considerable weight to two significant flaws in the employers' explanation for its selection decision:  (1) the fact that the defendant "rel[ied] heavily . . . on subjective considerations,'" namely, the candidates' supposed interview performance in making its selection, and (2) the interview panel's failure to retain all of the panelists' interview notes.  <u>Hamilton</u>, 666 F.3d at 1356-55 (quoting <u>Aka</u>,156 F.3d at 1298).  Defendant tried to sidestep the notion that the selection process here was entirely subjective by claiming that Mr. Reid was "independently" deemed to be qualified for the OAQA Director position through HR's supposedly objective screening process.  Def. Mot. at 9, 16.  The record shows that is certainly not the case.  Instead, defendant committed the same two flaws in the selection process that were committed in <u>Hamilton</u>, calling into serious question the credibility of its explanation that it selected Mr. Reid because he performed better than Ms. Makray during his interview.

### 1. The HR Screening Process Did Not Objectively Determine That Mr. Reid Met the Qualifications for the Position.

A review of HR's screening process shows that it was <u>not</u> an "objective determination" of the applicants' qualifications for the position, but more of a rubber stamp of the applicants' own self-serving assessments of their experience and expertise.  Def. Mot. at 9, 16.  Every in-house candidate was given an interview as a courtesy, even the male applicant who was scored the lowest.  Exh. 21; Exh. 7; Raponi Dep. at 72.  If HR had verified the candidates' written applications, it

would have eliminated Mr. Reid.  <u>See</u> Woodford Dep. at 69.  He admitted that his resume and self-assessment contained information that was <u>not even true</u>, including the graduate degree and auditing certifications he listed.  Exh. 24 at 3; Exh. 3 at 2; Reid Deposition at 30, 34-35.  He was also deemed qualified despite the fact that he did not submit a current resume or the required SF-50 reflecting his time in grade.  Exh. 3 at 1; Exh. 22; Lacey Dep. at 28-29.  Even with lying, Mr. Reid scored just a fraction of a point above Ms. Makray on the self-assessment. Exh. 22.

> **2.  Defendant's Claim That Mr. Reid Interviewed Better Than Ms. Makray Is Entirely Subjective.**

Aside from its contention that Mr. Reid was more qualified for the OAQA Director position – which plaintiff can readily disprove – defendant claimed to have selected Mr. Reid based solely on the subjective ground that he supposedly outperformed Ms. Makray during his interview.  Def. Mot. at 2, 9, 14, 18.  Explanations like this are treated "with caution on summary judgment": "[p]articularly in cases where a jury could reasonably find that the plaintiff was otherwise significantly better qualified than the successful applicant, an employer's asserted strong reliance on subjective feelings about the candidates may mask discrimination."  <u>Aka</u>, 156 F.3d at 1298; <u>Hamilton</u>, 666 F.3d at 1356.  <u>Hamilton</u> provides a multitude of reasons why this Court should be particularly cautious of defendant's reliance on the candidates' interview performance here.  666 F.3d at 1356-57.

> **i.  A Reasonable Jury Could Infer That Mr. Reid Did <u>Not</u> Out-Perform Ms. Makray At His Interview.**

Perhaps most notably, <u>Hamilton</u> provides significant reason to doubt that Mr. Reid performed well at his interview:  his utter inability to describe even the most basic facets of his duties in OAQA during his deposition, along with his extensive record of poor communication skills.  <u>Hamilton</u>, 666 F.3d at 1356-57.  Mr. Reid's inability to communicate was on full display

during his deposition in this litigation.  He claimed that he spent "about an hour and a half" at his interview mostly discussing his experience in Quality Assurance and his duties as Acting Director.[25]  Reid Dep. at 40-41.  Yet, when pressed on deposition about what he accomplished as acting director, Mr. Reid was unable to describe <u>anything</u> of substance that he had done in that role:

A       I signed off on all the audits that came to me.

Q       How many would that have been?

A       I couldn't answer that.

Q       2? 5? 10? 100? Anything?

A        (Witness shrugging shoulders.)

Reid Dep. at 28.  He struggled to elaborate on the types of quality work he was assigned during his time with VA, and could not provide an answer – even an <u>approximation</u> – of how many quality reviews he performed for OAQA at DOL.  Reid Dep. at 15, 26.   He could not even properly name all four of his current subordinates.  Reid Dep. at 12-13.  If Mr. Reid were "to testify at trial as [he] did in [his] deposition, a jury might not only find [him] markedly less qualified" than Ms. Makray, "but <u>also doubt the strength of [his] communication skills and [his] ability to perform well under the pressure of an interview</u>."  <u>Hamilton</u>, 666 F.3d at 1357 (emphasis added).

In addition, Mr. Reid's former supervisor, Mr. Coyle, repeated time and again during his deposition that Mr. Reid is "a poor communicator."  Coyle Dep. at 45-46, 56, 60.  He explained that Mr. Reid's peers do not hold him in a very high regard because of that fact, to which many OA managers can attest.  Coyle Dep. at 45; Donovan Decl., ¶ 12; Edwards Decl., ¶ 9; Allen Decl., ¶¶ 2-4; Woodford Dep. at 104.  In fact, Mr. Coyle even stated that Mr. Reid performed poorly

---

[25]      It is clear from the record that all three interviews together took less than one hour. Exh. 8 at 1-3; Woodford Dep. at 40-42; Makray Decl., ¶ 12.

during his interview to join DOL as an Assistant Director.  Coyle Dep. at 60-64.  This calls into serious question defendant's claim that he outperformed Ms. Makray in the interview, especially when that same supervisor described her as a "very good" communicator who is extremely knowledgeable, instructs training courses with "command," and has been time and again lauded for her ability to clearly convey complex technical auditing issues.  Coyle Dep. at 33-34; Woodford Dep. at 49-51, 130; Warren Dep. at 25; Allen Decl., ¶¶ 4-6; Edwards Decl., ¶¶ 2-3, 5, 9; Gers; Decl., ¶ 9.

### ii. The Panelists' Account of the Interviews Do Nothing to Support Their Decision to Select Mr. Reid.

Moreover, here, as in Hamilton, none of the panelists could provide any "concrete examples" of how Mr. Reid might have outperformed Ms. Makray because none of them can recall the substance of any of the candidates' responses. Hamilton, 666 F.3d at 1356; Raponi Dep. at 63-64; Yarbrough Dep. at 48; Dixon Dep. at 41, 43, 47-48.  Mr. Raponi was actually the only one of the three panel members that claims Ms. Makray's interview went poorly.  Raponi Dep. at 64.  He took fewer and fewer notes of Ms. Makray's responses as the interview progressed, and was visibly disinterested and hostile to her answers, giving a heavy sigh and shaking his head at her. Makray Decl., ¶ 11.  Mr. Dixon admitted that he was impressed with Ms. Makray's interview, and Mr. Yarbrough stated that none of the candidates "did a bad job."  Dixon Dep. at 46; Yarbrough Dep. at 57.  But nothing about the panelist's recollection of the candidates' interview performances provides "concrete examples of poor answers" on Ms. Makray's part – or, for that matter, strong answers on Mr. Reid's part – that "might have grounded their subjective assessment in more objective facts."  Hamilton, 666 F.3d 1356-57.

Nor do the panelists' contemporaneous accounts of the interview prove anything about Ms. Makray and Mr. Reid's respective performances.   Mr. Dixon's notes contain no comments,

"positive or negative," regarding either candidate and demonstrate nothing about how well they performed.  Exh. 8 at 5-10; <u>Hamilton</u>, 666 F.3d at 1356.  Mr. Yarbrough threw his notes away after the interview, in violation of federal and internal DOL regulations.  29 C.F.R. § 1602.14; 5 C.F.R. § 335.103; IG Directive 3-335 at 23.  This could "lead a reasonable juror to doubt" that Mr. Reid performed better than Ms. Makray at the interview, especially in light of the fact that Mr. Dixon's notes reflect – and he admitted to OA staff – that he lowered some of his scores of Ms. Makray and raised his scores of Mr. Reid during the panel's deliberation.  <u>Hamilton</u>, 666 F.3d at 1356; Edwards Decl., ¶ 8; Exh. 8 at 7-10.

### D. Defendant Has An Extensive History Of Discriminating Against Women, Including Ms. Makray.

Finally, defendant has a lengthy track record of discrimination against women, including Ms. Makray, and this track record is highly probative to Ms. Makray's claim of sex discrimination. The Supreme Court recognized the probative value of such evidence.  520 U.S at 581.  <u>Sprint</u>, 520 U.S. at 381; <u>United Airlines v. Evans</u>, 431 U.S. at 558.   In case after case over the coming decades, so has the D.C. Circuit.  <u>Czekalski v. Peters</u>, 475 F.3d 360, 368 (2007); <u>Parker v. HUD</u>, 891 F.2d 316, 321 (D.C. Cir. 1989); <u>Morris v. WMATA</u>, 702 F.2d 1037, 1045-46 (D.C. Cir. 1982); <u>Miller v. Poretsky</u>, 595 F.2d 780, 784-85, 790-91 (D.C. Cir. 1978); <u>Jones v. WMATA</u>, 946 F. Supp. 1011, 1019 (D.D.C. 1996) (Lamberth, C.J.).

Ms. Makray faced discriminatory treatment by defendant on a multitude of occasions before being passed over for promotion to OAQA Director, as detailed in pages 25 to 27 of this Opposition.   At least four other women from OA have faced similarly abhorrent treatment by Mr. Raponi.  This Opposition details defendant's discriminatory actions against Barbara Warren, the former Audit Director of OIG Headquarters at pages 27 through 29; against Renee Harrison-Womack at page 29; and against Janine Wagner-Sandoval at page 29; and against Katrina Bynes

at 29. With this extensive backdrop, a reasonable juror could certainly conclude that defendant's

decision to preclude Ms. Makray from being promoted to OAQA Director was discriminatory.[26]

## **CONCLUSION**

For the foregoing reasons, Plaintiff respectfully request this Court deny defendant's motion

for summary judgment and allow this case to proceed in a trial on the merits.

Respectfully submitted,

_____/s/_____
Robert C. Seldon, Esq.
 D.C. Bar No. 245100

_____/s/_____
Lauren E. Marsh, Esq.
 D.C. Bar No. 1011323
Seldon Bofinger & Associates, P.C.
1319 F Street, N.W., Suite 200
Washington, D.C.  20004
(202) 393-8200
Counsel for Plaintiff

---

[26] Defendant's motion concludes with a parting shot aimed to defeat its liability under the mixed motive analysis contained in the 1991 amendment to Title VII, 42 U.S.C. §§2000e-2(m).  For the most part, defendant simply incorporates the factual arguments it raised earlier in its dispositive motion.  Def. Mot. at 25-26.  These arguments are not in need of further response.