## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| LAURA J. MAKRAY,<br><br>    Plaintiff,<br><br>  v.<br><br>THOMAS PEREZ, *Secretary, U.S. Department of Labor*<br><br>    Defendant. | Civil Action No. 12-520 (BAH)<br><br>Judge Beryl A. Howell |

## <u>MEMORANDUM OPINION</u>

The plaintiff, Laura Makray, prevailed at trial on her claim that her employer, the Office of Inspector General ("OIG") of the U.S. Department of Labor ("DOL" or "defendant"), discriminated against her on the basis of her gender, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*, and the jury awarded her damages of $200,000.00 stemming from her non-selection for promotion to Director of DOL's Office of Audit Quality Assurance in January 2011.  *See* Compl. ¶ 9, ECF No. 1; Judgment on the Verdict, ECF No. 71. With this judgment now final, the plaintiff seeks reimbursement of attorneys' fees and litigation costs she incurred in pursuing her successful claim throughout the past several years.  The parties have largely resolved any remaining differences as to these fees and costs, leaving in dispute only the reimbursement rate for roughly 350 hours billed by the plaintiff's lead counsel to prepare for trial and present the case to the jury.  Pending before the Court is the plaintiff's Petition for a Partial Award at the Salazar/LSI Rate ("Pl.'s Pet."), ECF No. 85, to cover these trial preparation and presentation hours.  For the reasons set out below, the plaintiff's request for reimbursement for these hours at the applicable rate established in *Salazar v. District of Columbia*, 123 F. Supp. 2d 8 (D.D.C. 2000), is granted.

I.      **BACKGROUND**

Compared to typical employment discrimination claims, the plaintiff's Title VII gender

discrimination claim against DOL presented several unique challenges.  First, the DOL

component accused of gender discrimination is the supposed watchdog for the very federal

agency tasked with enforcing federal labor and employment laws.  Thus, the DOL OIG is far

from a conventional defendant.  Since DOL OIG functions ostensibly as an arm of federal law

enforcement, the plaintiff's success at trial rested in large measure on her ability to convince the

jury that senior DOL OIG officials, who themselves are experienced investigators responsible for

rooting out misconduct within DOL, intentionally discriminated against the plaintiff because she

is a woman.  Pl.'s Pet. at 20 (citing Decl. Robert C. Seldon (Apr. 21, 2015) ("Seldon Decl.")

¶ 75, ECF No. 85-1).  Indeed, during the course of the two-week trial, the jury in this case heard

testimony from sixteen witnesses who were current or former DOL officials, including senior

officials directly involved in the selection process that led to the plaintiff's challenged non-

selection for promotion.  Minute Entries, dated Feb. 9–13, 18–20, 2015; Seldon Decl. ¶ 73.  A

number of these officials were called to testify as adverse witnesses during the plaintiff's case-in-

chief, requiring plaintiff's counsel to undermine, methodically and persuasively, the credibility

of these experienced officials regarding their purported basis for failing to promote the plaintiff.

*Id.* ¶ 75.

Second, even where a witness was inclined to be supportive of the plaintiff's position,

eliciting such testimony before the jury was a difficult task.  Though the Court denied the

plaintiff's blanket request to treat witnesses who remained employed at DOL OIG as hostile, *see*

Trial Tr. (Feb. 11, 2015 AM) at 8:13–13:18, these witnesses had to testify in front of their boss,

Assistant Inspector General ("AIG") for Audit Elliot Lewis, who was accused of condoning the

discriminatory conduct engaged in by his management team and sat at defense table as the

agency representative during trial, *see*, *e.g.*, *id.* at 4:14-17.  Despite this potential chill of having

to provide critical testimony about a current supervisor's management, some current DOL OIG

employees nonetheless testified in support of the plaintiff's claim.  One such current DOL OIG

employee, who served as the plaintiff's immediate supervisor and Director of the Office of

National Talent Pool and Training, gave troubling testimony about experiencing setbacks at

work after he provided testimony favorable to the plaintiff at an earlier deposition. *Id.* at 59:16–

61:13 (Testimony of Richard Woodford).  Specifically, this witness testified at trial that, after he

discussed his prior deposition in this matter with AIG Lewis, he lost his staff of three subordinate

direct reports, making it "more challenging . . . to get [work] done."  *Id.*  AIG Lewis and his

deputy are responsible for the assignment of staff to this witness's department.  *Id.*[1]

Finally, the plaintiff's presentation of her case was further complicated by DOL's shifting

defenses and legal positions both before and during trial.  Pl.'s Pet at 19–20; *see also* Seldon

Decl. ¶¶ 68–70.  As just a sampling of the moving target presented to the plaintiff's attorneys,

DOL argued initially in its motion for summary judgment that the plaintiff's non-selection for

promotion stemmed in part from her relative lack of expertise in audit quality assurance.  Def.'s

Mem. Supp. Mot. Summ. J. at 24, ECF No. 19 (arguing that selectee "had considerably more

directly related experience [than] Ms. Makray, having served as an auditor for 20 years at the

time of his promotion, whereas Ms. Makray did not have auditing as a part of her position

description at the time of her interview, but as of the time of her interview was assigned audits

---

[1]      In light of AIG Lewis's presence at trial and the testimony from Mr. Woodford regarding his loss of staff to
perform his job after giving deposition testimony favorable to the plaintiff, the government assured the Court that
government counsel had cautioned the agency about retaliating against witnesses testifying at trial. Trial Tr. (Feb.
13, 2015 AM) at 142–43.

on an ad hoc basis"); Pl.'s Pet. at 19.[2]  In subsequent briefing, however, the defendant abandoned

this position, arguing that "in-depth technical expertise . . . [had] no basis in the reality of this

hiring decision," Def.'s Reply Mem. Supp. Mot. Summ. J. at 11, ECF No. 27 (internal quotations

omitted), only to later revive its contention, during its opening statement at trial, that the plaintiff

was not promoted due partially to her relative lack of expertise, Trial Testimony (Feb. 9, 2015

PM) at 59.  DOL also posited in its opening statement that the plaintiff's non-selection was due

to her inferior interview performance, her purported lack of leadership skills and, for the first

time, her lack of interpersonal skills.  *Id.* at 59:24–60:3, 62:14–63:24; Pl.'s Pet. at 19.[3]  In

support, the defendant elicited extensive testimony at trial from DOL OIG officials who

previously testified in depositions that they did not participate in—or did not recall their

participation in—the challenged selection process.  *Id.* at 19–20 (citing Seldon Decl. ¶70).

Notwithstanding the obvious pressures on witnesses, as well as the shifting defense

theories to justify the agency's treatment of the plaintiff (as well as other women who had

worked in the same agency component and testified about their perceptions of unfair treatment

under the same supervisor and his management team), the plaintiff prevailed at trial, with the

jury awarding substantial economic damages.  *See* Judgment on the Verdict.  This Court also

---

[2]      Evidence presented at trial demonstrated that the plaintiff had literally written the Handbook of Policy and
Procedures used by the DOL OIG's Office of Audit Operations, *see, e.g.*, Trial Tr. (Feb. 10, 2015 PM) at 58
(Testimony of Barbara Warren); Trial Tr. (Feb. 11, 2015 PM) at 33:11–34:7 (Testimony of Richard Woodford); *id.*
at 28 (Testimony of Robert Coyle), and was an in-house resource expert for audit guidance for auditors, *see e.g.*,
Trial Tr. (Feb. 11, 2015 PM) at 35:16–37:6 (Testimony of Richard Woodford); Trial Tr. (Feb. 11, 2015 PM) at
32:23–33:7 (Testimony of Robert Coyle).
[3]      The defendant suggested at trial that, by comparison to the plaintiff, the candidate selected for the Director
position gained leadership experience in the U.S. Army, Trial Tr. (Feb. 9, 2015 PM) at 58, where as a Staff Sergeant
in the Army Judge Advocate General Corps, the selectee explained that he worked as a "Court Reporter and a
paralegal," *id.* at 39 (Testimony of Melvin Reid).  By contrast, the plaintiff served on active duty in the U.S. Army
for three years and the Army National Guard for eighteen years, *id.* at 91 (Testimony of Laura Makray), where she
rose to the rank of Major, with leadership responsibility "for anywhere from five to 125 soldiers," *id.* at 79–80.

awarded nearly all of the plaintiff's requested equitable relief.  Minute Order, dated Aug. 24, 2015.[4]

    With the merits of the plaintiff's claim now resolved, the parties have agreed upon a "partial, interim" fee award under which time billed by the plaintiff's attorneys would be reimbursed, at a minimum, at rates provided by the USAO *Laffey* Matrix.  Pl.'s Pet. at 1 & n.1. In total, this interim award entitles the plaintiff to at least $634,564.20 in attorneys' fees in connection with the 1667.60 hours her attorneys billed in connection with her underlying Title VII claim.  *Id.*  To arrive at this stipulated total, the plaintiff's counsel voluntarily excluded more than 100 hours of attorney time, including sixty-three hours of time deemed to be "duplicative or excessive," and an across-the-board 10% reduction (totaling 54.21 hours) in the hours billed by a partner who assisted in representing the plaintiff.  Seldon Decl. ¶ 52.  These voluntary adjustments reduced the total overall award by at least $29,000.00.  *See id.* ¶¶ 93–94.  As a result, the stipulated interim total includes: (1) 577.2 hours billed by the plaintiff's lead trial counsel, to be reimbursed at a rate of $520.00 per hour; (2) 233.35 hours billed by a partner, to be reimbursed at a rate of $495.00 per hour; (3) and 857.1 hours billed by an associate, 542.10 of which to be reimbursed at a rate of $255.00 per hour and the remainder of which to be reimbursed at a rate of $300.00 per hour.[5]

---

[4]    In accordance with the parties' Stipulation Regarding Equitable Relief, ECF No. 122, the Court granted, *inter alia*, the following equitable relief to the plaintiff: (1) promotion to the Director position, retroactive to the date on which she would have been promoted had she been selected in the first instance; (2) back-pay, taking the form of regular salary payments totaling $40,275.20, taking into account deductions and retirement contributions, as well as interest, as specified by the Backpay Act, 5 U.S.C. § 5596; (3) back-pay, taking the form of bonuses in the amount of $10,343.08, as well as interest at the rate of 3% compounded daily; (4) contributions to the plaintiff's Thrift Savings Plan owed as a result of her total back-pay award; (5) reinstatement of 644 days of annual leave and 104 days of sick leave taken by the plaintiff to participate in this case; and (6) a total of $109,548.45 in attorneys' fees and costs incurred in the equitable relief phase of this case.  Order Regarding Equitable Relief, ECF No. 125.

[5]    The associate's hourly rate increased in June 2014 when she gained an additional year of experience and thereby became eligible for the next-highest rate applicable under the USAO *Laffey* Matrix.

Beyond the interim award of $634,564.20 in attorneys' fees, the plaintiff's present petition requests an "additional incremental" award of $92,536.00 reflecting an increased reimbursement rate for the 344 hours her lead counsel billed in connection with preparation for and presentation at trial.  Pl.'s Pet. at 1 & nn.1–2.

## II.    LEGAL STANDARD

Under Title VII, the court "in its discretion, may allow the prevailing party . . . a reasonable attorney's fee (including expert fees) as part of the costs."  42 U.S.C. § 2000e-5(k). While Title VII bars the United States from recovering attorneys' fees, the statute explicitly provides that "the United States shall be liable for costs the same as a private [employer]."  *Id.* In general, "[a] reasonable fee is one that is 'adequate to attract competent counsel, but that does not produce windfalls to attorneys.'"  *West v. Potter*, 717 F.3d 1030, 1033 (D.C. Cir. 2013) (quoting *Blum v. Stenson*, 465 U.S. 886, 897 (1984)).

With this standard in mind, the D.C. Circuit has developed a "three-part" analysis for assessing whether a requested fee award is reasonable under federal statutes authorizing fee-shifting.  *Eley v. District of Columbia*, 793 F.3d 97, 100 (D.C. Cir. 2015).  Under this three-step analysis, "[a] court must: (1) determine the number of hours reasonably expended in litigation; (2) set the reasonable hourly rate; and (3) use multipliers as warranted."  *Salazar ex rel. Salazar v. District of Columbia*, 809 F.3d 58, 61 (D.C. Cir. 2015) (internal citations and quotations omitted).  With regard to the proposed hourly rate, the Court considers three sub-elements: "(1) 'the attorneys' billing practices,' (2) 'the attorneys' skills, experience, and reputation' and (3) 'the prevailing market rates in the relevant community.'"  *Id.* at 62 (quoting *Covington v. District of Columbia*, 57 F.3d 1101, 1107–08 (D.C. Cir. 1995)).  In evaluating the factors that inform the appropriate reimbursement rate, there is a "strong presumption that the fee yielded by the now-

ubiquitous 'lodestar' method, which bases fees on the prevailing market rates in the relevant community, is reasonable." *West*, 717 F.3d at 1034 (citing *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542 (2010)).

"The 'fee applicant bears the burden of establishing entitlement to an award, documenting the appropriate hours, and justifying the reasonableness of the rates.'" *Eley*, 793 F.3d at 100 (quoting *Covington*, 57 F.3d at 1107–08). Once an applicant meets this initial burden, a presumption applies that the number of hours billed and the hourly rates are reasonable. *Covington*, 57 F.3d at 1110–11; *see also Jackson v. District of Columbia*, 696 F. Supp. 2d 97, 101 (D.D.C. 2010) (citing *Blackman v. District of Columbia*, 677 F. Supp. 2d 169, 172 (D.D.C. 2010)). At that point, the burden shifts to the opposing party to "provide specific contrary evidence tending to show that a lower rate would be appropriate." *Covington*, 57 F.3d at 1109–10 (quoting *Nat'l Ass'n of Concerned Veterans v. Sec'y of Def.*, 675 F.2d 1319, 1326 (D.C. Cir. 1982)).

## III.    DISCUSSION

After nearly four years of litigation, and close to a year after the plaintiff prevailed at trial on her claim that she was discriminated against on the basis of her gender while serving in DOL's OIG, the remaining issue in dispute is relatively straightforward. In opposing the present fee application, DOL does not dispute that the plaintiff, having prevailed on her underlying Title VII action, is entitled to reimbursement for reasonable attorneys' fees incurred in pursuing her successful claim. Def.'s Opp'n Mot. *Salazar* Rates & Alter. Cross-Mot. Discovery ("Def.'s Opp'n") at 1, ECF No. 88. Likewise, to calculate these reimbursable fees, the parties have stipulated to the total number of hours reasonably billed by the plaintiff's attorneys, as well as the rate at which the majority of these hours will be reimbursed. Pl.'s Pet at 1 & n.1. Notably,

with respect to the applicable hourly rate for reimbursement, DOL does not dispute that this gender discrimination lawsuit qualifies as complex federal litigation. *See generally* Def.'s Opp'n. With these larger issues resolved, the present dispute centers on 344 hours billed by the plaintiff's lead trial counsel, Robert C. Seldon, Esq., in connection with his preparation for trial and his successful presentation before the jury. While DOL does not contest the *number* of hours at issue, the agency contests the *rate* at which the plaintiff should be reimbursed for these trial preparation and presentation hours in this complex federal litigation. *Id.* at 5.

Specifically, the parties dispute which of two variations of the familiar *Laffey* fee matrix should be used to calculate the reasonable reimbursement rate for this subset of the total hours expended by one of the plaintiff's attorneys. Initially set out in *Laffey v. Northwest Airlines, Inc.*, 572 F. Supp. 354, 371 (D.D.C. 1983), *aff'd in part, rev'd in part on other grounds*, 746 F.2d 4 (D.C. Cir. 1984), which was a Title VII class action employment discrimination lawsuit brought by a class of female flight attendants, the *Laffey* matrix recommends a presumptive maximum hourly rate for Washington, D.C.-area attorneys engaged in "complex federal litigation," *id.* at 372. In the years since its introduction, the original *Laffey* matrix has spawned two primary variations: (1) a version updated annually by the U.S. Attorney's Office for the District of Columbia, which is linked to inflation, as measured by the Consumer Price Index ("CPI") for all items in the Washington, D.C. area ("USAO *Laffey* Matrix"); and (2) an "enhanced" version, first approved in *Salazar v. District of Columbia*, 123 F. Supp. 2d at 13, which is adjusted for inflation using the Legal Services Index ("LSI") of the nationwide CPI ("*Salazar*/LSI Matrix"). *See Eley*, 793 F.3d at 101–02.

As noted, the plaintiff's present petition requests an "additional incremental" award of $92,536.00 reflecting an increased reimbursement rate for the 344 hours her lead counsel billed

in connection with preparation for and presentation at trial.  Pl.'s Pet. at 1 & n.2.  Arguing that the rate supplied by the USAO *Laffey* Matrix, equating to $520 per hour, "does not accurately represent [her lead trial counsel's] true market rate," the plaintiff contends that these hours should be reimbursed instead at the rate supplied by the *Salazar*/LSI Matrix, under which an attorney of her counsel's experience is entitled to an hourly rate of $789.  *Id.* at 1–2.  Even though the plaintiff contends that this enhanced rate more closely reflects the actual value of her attorneys' services throughout this case, *id.* at 22–23, she seeks enhanced reimbursement only for her lead counsel's time in connection with trial due to her trial counsel's specific experience and expertise in trying employment discrimination cases before a jury, as well as the particular demands associated with trial preparation and presentation in this case, as described *supra* in Part I.  Seldon Decl. ¶ 48.[6]

Following a brief summary of this Court's prior consideration of the relative merits of the competing *Laffey*-derived fee matrices, as well as recent D.C. Circuit precedent addressing the use of these matrices to calculate reasonable attorneys' fees, the parties' arguments addressing the plaintiff's requested incremental fee award are considered in turn below.

### A.   THE *SALAZAR*/LSI MATRIX PROVIDES A CONSERVATIVE ESTIMATE OF THE COST OF LEGAL SERVICES FOR COMPLEX FEDERAL LITIGATION IN THE WASHINGTON, DC AREA

For a number of years, Judges on this Court have struggled to identify a consistent approach to calculating reasonable attorneys' fees for prevailing civil rights plaintiffs.[7]  In

---

[6]     The plaintiff likewise indicates that her request for an enhanced rate for only a portion of her trial counsel's total billed hours is consistent with the common billing practice of reducing total accrued fees charged to a paying client.  Pl.'s Pet. at 27–29.

[7]     Over thirty years ago, Chief Judge Aubrey E. Robinson, Jr., who issued the decision establishing the *Laffey* Matrix, expressed "dismay[] at the course [of that] fee litigation" and described the district court as "caught in the midst of this morass, vainly attempting to negotiate the path charted by the Court of Appeals: to avoid allowing fee applications to assume 'massive proportions' and dwarf the underlying litigation on the merits; to avoid becoming ensnared in the minute details of the professional relationship under scrutiny; and yet to insist upon specific

particular, "[m]uch ink has been spilled . . . discussing the relative merits" of the two *Laffey*-derived fee matrices at issue here. *Citizens for Responsibility & Ethics in Wash. v. U.S. Dep't of Justice*, 80 F. Supp. 3d 1, 3 (D.D.C. 2015) (collecting cases). While recent decisions by the D.C. Circuit provide some guidance in resolving the instant dispute, these decisions also leave some uncertainty as to which *Laffey*-derived fee matrix should apply, if at all, to which types of civil rights cases. With this in mind, the discussion that follows summarizes this recent precedent before noting areas of remaining uncertainty in this Circuit's jurisprudence governing the appropriate rate to apply in federal litigation to enforce federal civil rights statutes providing for payment of attorneys' fees to prevailing plaintiffs.

### 1. *Reasonable Reimbursement Rates Should be Consistent with Prevailing Market Rates for "Similar" Services*

This Court discussed at length the relative merits of the USAO *Laffey* Matrix and the *Salazar*/LSI Matrix, in *Eley v. District of Columbia*, 999 F. Supp. 2d 137 (D.D.C. 2013) *vacated on other grounds*, 793 F.3d 97 (D.C. Cir. 2015). There, the Court awarded attorneys' fees based on the *Salazar*/LSI Matrix to a prevailing plaintiff under the fee-shifting provision of the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400, *et seq. Id.* at 168. Comparing the USAO *Laffey* and *Salazar*/LSI matrices, the Court concluded: "The variation in the hourly legal billing rates reflected in the [two matrices] is due to two methodological differences: first, the USAO matrix and the LSI-adjusted matrix use as starting points billing rate surveys conducted at different times; and, second, in order to provide an approximation of current billing rates, an inflation adjustment derived from different parts of the CPI compiled by

---

documentation for every component of the fee award; to explain fully the premises of its 'discretionary' judgments; and to state specifically why the fee opponent's claims lack merit." *Laffey*, 572 F. Supp. at 388–89.

the Bureau of Labor Statistics is applied to the rate survey information." *Id.* at 150 (citing *Heller v. District of Columbia*, 832 F. Supp. 2d 32, 41 (D.D.C. 2011)).

To determine which matrix more accurately reflects the best estimate of the actual cost of legal services in the District of Columbia, the "question, therefore, is which assumption carries more logical force: (a) the assumption underlying the USAO matrix that the rate of increase in the cost of legal services in the Washington, D.C. area is generally the same as the costs for all other costs of goods and services in the area; or (b) the assumption underlying the LSI-adjusted matrix that the increase in the cost of legal services in the Washington, D.C. market generally matches the increases in those costs nationally." *Id.* at 154.  In light of evidence that the cost of legal services in the District tends to rise more quickly than the national average, this Court concluded that "LSI-adjusted matrix is probably a *conservative* estimate of the actual cost of legal services in this area, but at the very least it appears to be a more accurate reflection of the cost of legal services both in this community and nationwide," and awarded fees based on the *Salazar*/LSI Matrix.  *Id.*

Although this final fee award was later vacated by the D.C. Circuit, *Eley*, 793 F.3d at 105, the Circuit's reasoning did not disturb this Court's underlying analysis of the comparative strengths of the competing *Laffey* matrices.  Instead, on appeal, the D.C. Circuit reiterated that *Laffey*-derived matrices, like other fee matrices, serve as a "'useful starting point' in calculating the prevailing market rate" for legal services in the District.  *Id.* at 100 (quoting *Covington*, 57 F.3d at 1109).  To demonstrate that a rate provided by such a matrix is reasonable in an individual case, however, the Court emphasized that a fee applicant must "produce satisfactory evidence—*in addition to* the attorney's own affidavits—that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable

11

skill, experience and reputation." *Id.* (emphasis in original) (internal quotations and citation

omitted). Such evidence may include, *inter alia*, "'surveys to update [the applicable fee matrix];

affidavits reciting the precise fees that attorneys with similar qualifications have received from

fee-paying clients in comparable cases; and evidence of recent fees awarded by courts or through

settlement to attorneys with comparable qualifications handling similar cases.'" *Id.* at 101

(quoting *Covington*, 57 F.3d at 1109).

Under this evidentiary standard, the *Eley* Court found that the fee applicant failed to

present sufficient *additional* evidence to demonstrate that the *Salazar*/LSI rate was reasonable in

that case. In support of her requested rate, the *Eley* applicant presented evidence consisting of

(1) a declaration from her attorney describing his extensive experience in litigating IDEA cases,

for which he routinely charged paying clients at rates comparable to those supplied by the

*Salazar*/LSI Matrix; and (2) a declaration from the economist who developed the *Salazar*/LSI

Matrix and explained its various advantages as compared to the USAO *Laffey* Matrix and

identified four decisions between 1995 and 2011 where this Court and another federal court used

the *Salazar*/LSI Matrix to calculate reasonable fee awards. *Id.* at 102. According to the D.C.

Circuit, however, "[a]bsent from her submission . . . [was] evidence that her 'requested rates

[were] in line with those prevailing in the community for *similar services*,' *i.e.*, IDEA litigation."

*Id.* at 104 (emphasis in original) (quoting *Covington*, 57 F.3d at 1109). By contrast to the four

cases identified by the plaintiff's expert where the *Salazar*/LSI Matrix was used to calculate

reasonable fee awards, the Circuit cited information supplied by the defendant District of

Columbia identifying more than forty IDEA cases in which prevailing plaintiffs were reimbursed

at hourly rates below those supplied by the USAO *Laffey* Matrix. *Id.* at 104.[8] Given this

---

[8]      As this Court has explained, the forty-one IDEA cases referenced by the Circuit were decided between 2001 and 2012 and represent, at best, an incomplete account of fee awards approved by Judges in this Circuit to prevailing

asserted disparity, the D.C. Circuit concluded that the plaintiff had not "met her burden of 'justifying the reasonableness of the rates [she requested].'" *Id.* (quoting *Covington*, 57 F.3d at 1107). While the *Eley* Court rejected the application of the *Salazar*/LSI Matrix based on the evidence presented in that case, the Court expressly reserved judgment as to the applicability of either version of the *Laffey* Matrix to IDEA litigation and declined to opine on the relative merits of the competing *Laffey*-derived fee matrices more generally. *Id.* at 105.[9]

After the D.C. Circuit issued its decision in *Eley*, the parties were provided the opportunity to submit supplemental briefing addressing the relevance, if any, of the opinion to the issues raised in the instant petition. Minute Order, dated July 10, 2015. Both parties agreed that *Eley* bears significantly on the present dispute, but expressed opposite views of that decision's impact. Seeking to distinguish *Eley*, the plaintiff argues that she has presented ample evidence that the USAO *Laffey* Matrix significantly underestimates the market rate for an attorney with the experience and expertise of her lead trial counsel. Pl.'s Supp. Mem. Supp. Pl.'s Pet. at 2, ECF No. 103. In light of this evidence, and because there is no dispute that the plaintiff's Title VII action qualifies as "complex federal litigation," the plaintiff contends that *Eley* supports her request for an enhanced rate for a portion of her attorneys' time. *Id.* at 2–15.

DOL, on the other hand, argues that, under *Eley*, the plaintiff failed to meet her burden of demonstrating that the enhanced reimbursement rate she requests is reasonable. Def.'s Supp. Briefing in Light of *Eley* Decision by the D.C. Circuit at 2, ECF No. 104. While stopping short of arguing that employment discrimination cases represent a lower-priced submarket of

---

IDEA plaintiffs. *See Jones v. District of Columbia*, No. 15-CV-155 (BAH), 2015 WL 9907797, at *9–10 & nn. 8–12 (D.D.C. Oct. 29, 2015). A more comprehensive review of the relevant fee awards in recent IDEA cases in this jurisdiction suggests that a majority of Judges have concluded that prevailing IDEA plaintiffs are entitled to reimbursement at or *above* the rates supplied by the USAO *Laffey* Matrix, depending on the extent of proceedings that occurred when the case reached federal court. *Id.*

[9]    In a brief concurrence, one Judge on the panel expressed the view that the USAO *Laffey* Matrix "is appropriate for IDEA cases." *Eley*, 793 F.3d at 105 (Kavanaugh, J., concurring).

"complex federal litigation" in this locality, DOL contends that *Eley* "suggests that this Court should look to [prior] reported awards of attorney's fees in employment discrimination cases" to guide its review of the plaintiff's present motion. *Id.* at 2. In this regard, DOL points out that prevailing plaintiffs in two recent Title VII actions were reimbursed for attorneys' fees at or below rates provided by the USOA *Laffey* Matrix. *Id.* at 2–3. In addition, DOL relies on its expert's conclusion that the USAO *Laffey* Matrix tends to exceed the prevailing rates identified in a recent survey of all Washington-area attorneys. *Id.* at 3–6. Finally, DOL urges flat-out rejection of the plaintiff's requested fees because *Eley* "effectively ends the use of the *Salazar* Matrix as persuasive evidence of market rates." *Id.* at 8–10.

More recently, however, the D.C. Circuit confirmed that a fee award based on the more generous *Salazar*/LSI Matrix is reasonable, at least where the parties do not contest that the case involved "complex federal litigation."

### 2. The *Salazar/LSI* Matrix More Closely Approximates the Prevailing Market Rate for Complex Federal Litigation in the District of Columbia

The *Salazar*/LSI Matrix arose originally from a successful class action, brought under 42 U.S.C. § 1983, challenging certain aspects of the District of Columbia Medicaid program. *See Salazar*, 123 F. Supp. 2d at 9. As a result of this litigation, since 1999, the District has operated its Medicaid program pursuant to a settlement order under which the plaintiffs' counsel is entitled to regular reimbursement for monitoring the District's compliance. *Id.* at 10. This order was silent as to the applicable reimbursement rate, and the plaintiffs initially sought reimbursement at rates calculated by updating the original *Laffey* Matrix using the nationwide LSI. *Id.* at 13–14. The District countered in favor of reimbursement awards based on the USAO *Laffey* Matrix. *Id.* In a thorough and well-reasoned decision, Judge Gladys Kessler noted that the plaintiffs' proposed LSI-adjusted rates were "generally consistent" with three surveys of

14

Washington, D.C.-area attorneys and cited unrebutted expert evidence to conclude that the LSI is better suited to estimating prices in the legal industry than a more generalized measure of inflation used in the USAO *Laffey* Matrix. *Id.* at 14–15.

After declining to appeal two earlier fee awards based on these "enhanced" rates, the District recently challenged for the first time the reasonableness of these rates. *Salazar*, 809 F.3d at 63–64. Like the defendant agency here, the District did not dispute that the underlying litigation was sufficiently complex to merit reimbursement based on a *Laffey* Matrix. *Id.* at 64. Instead, the District renewed its earlier argument that the USAO *Laffey* Matrix, as opposed to the enhanced *Salazar*/LSI Matrix, supplied reasonable reimbursement rates for attorney efforts to monitor the District's compliance with the longstanding settlement order. *Id.* Thus, the District argued that the district court abused its discretion in awarding attorneys' fees based on the more generous LSI-adjusted rates. *Id.*

The D.C. Circuit disagreed. Since the District did not dispute that the relevant market was that of complex federal litigation, the *Salazar* Court considered only whether the plaintiffs "submitted sufficient evidence for the district court to conclude that the LSI *Laffey* Matrix applie[d]." *Id.* In support of their requested rates, the plaintiffs provided additional evidence, beyond their attorneys' own affidavits, including: (1) an affidavit of the economist who developed the *Salazar*/LSI Matrix explaining its various advantages, which largely mirrored the affidavit submitted by this economist in *Eley* and identified the same four cases in which the *Salazar*/LSI Matrix was used to calculate reasonable fee awards; (2) tables comparing national law firm rates, as compiled by the plaintiffs from public filings associated with prior successful fee awards, with the rates provided by both *Laffey*-derived matrices, which tables demonstrated that the rates provided by the *Salazar*/LSI Matrix more closely mirrored national averages; and

(3) recent National Law Journal Rate Surveys, which showed that, in one of the years for which fees were requested, high-end rates for partners in Washington, D.C. "far exceeded" the rates in even the *Salazar*/LSI Matrix.  *Id.* at 64–65.

Concluding that the District failed to rebut this evidence with "relevant arguments," the D.C. Circuit generally agreed that "'the LSI-adjusted matrix is probably a *conservative* estimate of the actual cost of legal services in this area.'"  *Id.* at 65 (emphasis in original) (quoting *Salazar v. District of Columbia*, 991 F. Supp. 2d 39, 48 (D.D.C. 2014) (quoting *Eley*, 999 F. Supp. 2d at 154)).  In so doing, the Court discounted evidence of prior fees awards approved by this Court using the USAO *Laffey* Matrix as non-binding.  *Id.* at 64 & n.1.  Thus, despite the District's assertion that rates higher than the USAO *Laffey* Matrix were no longer necessary "to 'attract competent counsel,'" the Court affirmed the plaintiffs' continued reimbursement using rates supplied by the *Salazar*/LSI Matrix.  *Id.* at 64.

This most recent holding, affirming application of the LSI/*Salazar* rates, demonstrates that DOL's death knell for the LSI rate was prematurely announced.  To the contrary, the plaintiff correctly points out that the *Salazar* Court "confirmed the superior accuracy of the LSI/*Salazar* rates" and that this *Salazar*/LSI Matrix represents a conservative estimate of the prevailing rates for legal services, at least for complex federal litigation, in the District.  Pl.'s Not. of Filing at 2, ECF No. 129.  Not discouraged, however, DOL discounts the D.C. Circuit's approval of an enhanced fee award in *Salazar*, as based on the "one-sided evidence that was before the District Court," Def.'s Resp. Pl.'s Not. of Supp. Auth. at 2–3, ECF No. 130, and suggests that *Salazar* does nothing to relieve the plaintiff of her burden to demonstrate that such rates are reasonable in *this* case.  *Id.*  Contending that *Salazar* "has little bearing" on the present dispute, DOL inexplicably argues that the plaintiff has failed to demonstrate that LSI-adjusted

16

rates constitute prevailing market rates "for Freedom of Information Act" ("FOIA"), 5 U.S.C. §

552, litigation in this jurisdiction. *Id.* at 1–2.[10]  By contrast, the agency suggests, DOL has

"provided very substantial evidence demonstrating that LSI-adjusted rates do not constitute

prevailing market rates for FOIA litigation in this District." *Id.* at 2.

### 3. *Establishing a Prevailing Submarket Rate for "Similar" Services Presents Significant Challenges*

Taken together, these recent D.C. Circuit decisions make clear that the *Salazar*/LSI

Matrix supplies reasonable reimbursement rates in "complex federal ligation," but that a fee

applicant must present sufficient evidence to support this requested reimbursement rate.  As yet,

however, the D.C. Circuit has offered less clarity regarding how courts should determine whether

a particular fee applicant has submitted sufficient evidence to justify a fee award based on LSI-

adjusted rates.  In particular, the D.C. Circuit's suggestion in these two recent opinions that

certain categories of federal litigation fall into distinct and discernable submarkets of legal

services, in which prevailing market rates applicable to the general run of "complex federal

litigation" may not apply, presents potential new complications for courts, as well as litigants,

seeking to calculate reasonable fee awards.

As discussed above, confronted with some of the same evidence, the *Eley* and *Salazar*

Courts reached starkly different conclusions regarding the reasonableness of the *Salazar*/LSI

Matrix.  In each case, the fee applicant relied primarily on affidavits chronicling the experience

and expertise of the applicant's attorneys, supplemented by evidence that the LSI more closely

approximates the actual rate of the cost of legal services in the District and that the LSI has, for

---

[10]    DOL's emphasis on the prevailing market rates for FOIA litigation has no obvious bearing on the present
dispute, and DOL provides no explanation to assist the Court in bridging this apparent logical gap.  Without more,
the Court is left to conclude that DOL's most recent filing reflects either a slap-dash response to the plaintiff's initial
notice addressing *Salazar* or simply a facsimile of a generic response filed in other, unrelated matters.

that reason, been used by this Court and other federal courts as the basis for calculation of reasonable rates and fee awards.  In response, the defendant in each case presented evidence purporting to show that—either in the particular context of IDEA litigation, or more generally— Judges in this district have awarded attorneys' fees based, at most, on the USAO *Laffey* Matrix. *Eley*, 793 F.3d at 104; Brief for Appellant, at 54, *Salazar*, 809 F.3d 58 (Nos. 14–7035, 14–7050), 2014 WL 7387253, at *51 (collecting cases).  Despite these broad similarities, the Court in *Salazar* departed from an earlier panel holding in *Eley* to conclude that the LSI-adjusted rates represent a reasonable estimate of the actual cost of legal services in the Washington, D.C. area for complex federal litigation.  *Salazar*, 809 F.3d at 65.  Distinguishing *Eley*, the *Salazar* Court observed that prior decision rested on the Court's view "that, in the particular context of IDEA claims, there is a submarket in which attorneys' hourly fees are generally lower than the rates in either of the *Laffey* Matrices."  *Id.* at 64.

With this "submarket" distinction in mind, *Salazar* confirms that LSI-adjusted rates are, at least for services "similar" to those rendered in complex federal litigation, a conservative estimate of the actual cost of such services in the District.  Thus, to the extent the D.C. Circuit in *Salazar* adopted the *Salazar*/LSI Matrix as an appropriate tool to calculate reasonable attorneys' fees, the reimbursement rates supplied by this matrix are presumptively reasonable for such services.  At the same time, under *Eley*, to be entitled to this presumption of reasonableness, the plaintiff must present sufficient evidence to show that the services for which reimbursement is sought qualify as complex federal litigation rather than a distinct, lower-priced submarket within the broader Washington, D.C. legal market.  This task may involve showing that a specific case (or category of federal civil rights cases with fee-shifting provisions, such as IDEA cases) is not

qualitatively distinct from typical "complex federal litigation" and does not warrant reimbursement below otherwise applicable prevailing market rates for such litigation.

Consequently, determination of the prevailing market rate may require a court to assess the relative complexity of a particular case (or category of civil rights cases) in order to identify relevant submarkets of similar legal services that amount to "complex federal litigation." Such searching review may require litigants in fee-shifting civil rights cases to build their respective evidentiary records, including expert declarations from economists and other legal practitioners of the same or similar type of litigation, together with analysis of historical data of fee awards and economic models. This, in turn, may lead to the sort of protracted proceedings that the Supreme Court has sought to avoid, in favor of relying on the lodestar method. As previously noted, the lodestar method relies primarily on the "prevailing market rates in the relevant community" to identify a reasonable reimbursement rate and generally provides an "objective" basis for calculating a reasonable fee award that "cabins the discretion of trial judges, permits meaningful judicial review, and produces reasonably predictable results." *Perdue*, 559 U.S. at 551–52 (internal quotations and citations omitted). It is precisely the objectivity offered by this method that underlies the "strong presumption" in favor of a lodestar figure under federal fee-shifting provisions. *Id.* at 553–54.

Despite the Supreme Court's stated goal of "reasonably predictable results" in federal fee litigation, *id.* at 552, recent D.C. Circuit precedent could be interpreted to require courts to engage in a market analysis to identify whether a particular case represents a submarket of federal civil rights litigation that falls outside the broad description of "complex federal litigation." The difficult presented by such an analysis are clear. For example, as noted, the *Eley* Court dismissed evidence of four prior cases, in which this Court and the U.S. District Court for

the District of New Jersey had awarded fees in non-IDEA cases under statutory fee-shifting

provisions based on the *Salazar*/LSI Matrix, as largely irrelevant to establishing prevailing rates

in IDEA litigation.  *Eley*, 793 F.3d at 102; *see also* Deferred Appendix, at 98–99, *Eley*, 793 F.3d

97 (No. 13–7196).  Two of these four cases involved litigation in this Court under 42 U.S.C. §

1983, and the other two cases from the District of New Jersey involved the citizen-suit

provisions of the Clean Water Act, 33 U.S.C. § 1365(a), and the Resources Conservation and

Recovery Act ("RCRA"), 42 U.S.C. § 6972.  Deferred Appendix, at 98–99, *Eley*, 793 F.3d 97

(No. 13–7196).  By contrast, the *Salazar* Court relied on the same collection of four cases to

conclude that "other federal courts [] have adopted the LSI *Laffey* Matrix," *Salazar*, 809 F.3d at

65 (citing Joint Appendix, at 2039–40, *Salazar*, 809 F.3d 58 (No. 14–7035, 14–7050)) and

largely dismissed evidence offered by the defendant to suggest that such rates have been adopted

in only a minority cases in this jurisdiction, *id.*[11]  The divergent views expressed by these two

recent Circuit panels may be reconciled as the *Salazar* Court opined, by relegating IDEA

litigation to a lower-priced submarket of federal civil rights litigation. *Salazar*, 809 F.3d at 64.

Yet, this begs the question of the evidence litigants must adduce to identify (or avoid) such

submarket categorization, with the concomitant risk of undermining the critical objectivity and

predictability of the lodestar approach.

　　　　Finally, as the Supreme Court has explained, the ready administrability of the lodestar

method is among its primary virtues and serves the "related interest in avoiding burdensome

satellite litigation."  *City of Burlington v. Dague*, 505 U.S. 557, 566 (1992) (quoting *Hensley v.*

---

[11]　　Following *Salazar*, the import of evidence of prior fee awards is somewhat unclear.  While the *Salazar* Court cited recent fee awards as evidence of the prevailing market rate for legal services in this jurisdiction, the Court reiterated in a footnote that these prior decisions were not "binding precedent" for the district court in identifying such prevailing rates.  *Salazar*, 809 F.3d at 64 n.1.  This stands in some tension with the *Eley* Court's emphasis on its view that a large number ("more than *forty*") of IDEA cases over the preceding decade had generated fee awards at rates below those supplied by the USAO *Laffey* Matrix, *Eley*, 793 F.3d at 104 (emphasis in original).

*Eckerhart*, 461 U.S. 424, 437, 103 S. Ct. 1933, 1941, 76 L. Ed. 2d 40 (1983)).  Requiring courts and litigants to expend substantial *additional* resources to engage in a largely unguided exploration of the myriad submarkets that potentially comprise the general market for legal services in the District runs counter to the Supreme Court's admonition that "[a] request for attorney's fees should not result in a second major litigation."  *Hensley*, 461 U.S. at 437.  Indeed, such protracted antitrust-style market analysis is precisely the species of litigation the Supreme Court sought to avoid in broadly adopting the lodestar method.

Fortunately, however, resolving these outstanding concerns may be left for another day. Here, DOL does not contest that the plaintiff's successful Title VII gender discrimination lawsuit amounts to "complex federal litigation."  DOL also does not posit that this lawsuit falls within a particular lower-priced submarket within the broader District-area legal market for complex federal litigation.  Instead, DOL contends only that the USAO *Laffey* Matrix more closely approximates the prevailing market rate for legal services for complex federal litigation in the Washington, D.C. area, and that the fee rates provided by this matrix are therefore reasonable under the fee-shifting provision of Title VII.

At a minimum, *Salazar* confirms that, at least in cases qualifying as "complex federal litigation," the *Salazar*/LSI Matrix likely provides a conservative estimate of the prevailing market rate for attorneys practicing in the District of Columbia.  Thus, where the parties do not dispute that a fee applicant is entitled to reimbursement using a *Laffey* matrix, and where the fee applicant presents evidence tending to show that the *Salazar*/LSI Matrix more closely approximates the prevailing market rate for the services rendered to the prevailing plaintiff, a defendant must do more than make the discredited argument that this rate is higher than necessary to attract competent counsel, *see infra* Part III.B.1.a., to rebut the plaintiff's requested

21

rate and instead must show that the requested rate is unreasonably high.  Set against this

background, the parties' present dispute regarding the plaintiff's request for an incremental

award based on the *Salazar*/LSI Matrix is discussed below.

**B.    THE PLAINTIFF'S REQUESTED REIMBURSEMENT RATE, BASED ON THE *SALAZAR*/LSI MATRIX, IS REASONABLE**

In support of her petition for an incremental award, the plaintiff contends that the USAO

*Laffey* Matrix fails to account for certain "identifiable qualities that make [her] attorney

especially attractive to a prospective client," and requests reimbursement at an enhanced rate to

reflect her attorney's true market value.  Pl.'s Pet. at 25.  As discussed in more detail below, the

plaintiff identifies two specific insufficiencies of the USAO *Laffey* Matrix in recognizing

experience and expertise, as applied in this case.

First, although the plaintiff's lead trial counsel, who has practiced for nearly forty years,

qualifies for reimbursement at the highest available rate of $520 under the USAO *Laffey* Matrix,

*id.* at 2, this rate still fails to account for the full number of years he has practiced.  Indeed, the

USAO *Laffey* Matrix supplies reasonable reimbursement rates based only on the number of years

since the attorney was admitted to the bar, and applies the highest available rate to all attorneys

with greater than twenty years of experience, without distinguishing those attorneys with double

those years of significant experience.

Second, the plaintiff contends that the rates provided by the matrix fail to take account of

an attorney's specific experience in a relevant field (*e.g.*, employment law) or forum (*e.g.*, before

a jury at trial in federal court).  *Id.* at 25–26.  As a result, given her counsel's consistent success

in litigating employment litigation cases to a successful verdict in federal court, the plaintiff

contends that even the maximum rate supplied by the USAO *Laffey* Matrix fails to reflect the

actual value of her counsel's efforts on her behalf.  *Id.* at 27.  Instead, the plaintiff contends that

the rate supplied by the *Salazar*/LSI Matrix for an attorney with more than twenty years' experience, which equates to $789 per hour, better approximates the true value of these efforts. *See id.* at 29.

DOL responds that the hourly rates included in the USAO *Laffey* Matrix are "adequate to attract competent counsel, but [do] not produce windfalls to attorneys."  Def.'s Opp'n at 3 (quoting *West*, 717 F.3d at 1033–34).  Contending that a fee award is reasonable where it "avoids awarding more than necessary to attract an adequate supply of competent counsel," DOL argues that the enhanced rate supplied by the *Salazar*/LSI Matrix would unreasonably overcompensate the plaintiff.  *Id.*  Specifically, DOL argues that the plaintiff has failed to demonstrate that the *Salazar*/LSI Matrix represents the "average" market rate for similar services in the Washington, DC area, as opposed to rates charged by the largest Washington-based firms.  *Id.* at 9. According to DOL, reimbursement at such rates "is flatly inconsistent" with the purported purpose of federal fee-shifting provisions to award "only enough to attract an adequate supply of competent counsel—and no more."  *Id.* at 14.

As apparent from the above summary, *supra* Part III.A., this Circuit's jurisprudence regarding federal fee-shifting provisions has continued to develop during the pendency of the present motion.  As a result, the parties' extensive submissions raise several preliminary issues regarding both the underlying purpose of fee-shifting provisions in federal civil rights statutes and the resulting analysis courts must undertake to calculate a reasonable fee award.

### 1.    *Preliminary Matters*

The present dispute ultimately turns on the question of which *Laffey*-derived fee matrix more closely approximates prevailing billing rates in the Washington, D.C. area for similar cases

of "complex federal litigation."  In connection with the present petition, however, the parties

have raised three antecedent and related issues that bear significantly on this underlying dispute.

> a.    *Actual Billing Rates Do Not Necessarily Dictate Reasonable Reimbursement Rates*

First, although DOL observes that the plaintiff's petition "probably" relies on the

*Salazar*/LSI Matrix to support her requested reimbursement rate, DOL questions whether the

plaintiff seeks to justify her requested rate on the actual rate her counsel charges to paying

clients. Def.'s Opp'n at 5.  In light of this perceived ambiguity, DOL suggests that the plaintiff

has "made no attempt to show that her [attorney] actually charges and collects [her requested

rate]," *id.*, and seeks limited discovery to establish both this attorney's customary rates and the

particular rates he charged in connection with this litigation, *id.* at 6–8.

To the extent that DOL means to suggest that the plaintiff must demonstrate that her

attorneys charge paying clients at rates comparable to her requested reimbursement rate, the

agency misunderstands the law of this Circuit.  The governing law used to be that fee awards to

prevailing plaintiffs' attorneys, who operated for-profit firms, were restricted to their customary

rates instead of the "prevailing market rates," *see Laffey*, 746 F.2d at 10, but the D.C. Circuit

overruled this restriction over twenty years ago in *Save Our Cumberland Mountains, Inc. v.*

*Hodel ("SOCM")*, 857 F.2d 1516, 1517 (D.C. Cir. 1988) (en banc) (overruling prior Circuit

holding in *Laffey* "that in awarding attorneys' fees to a private law firm[] that customarily

charges below the prevailing community rate in order to serve a particular type of client, courts

should calculate the 'reasonable hourly rate' according to the hourly rates charged in similar

cases by that firm, as opposed to rates that reflect the prevailing community rate for similar legal

services" (emphasis omitted)).  Instead, the *SOCM* Court held that "the prevailing market rate

method . . . used in awarding fees to traditional for-profit firms and public interest legal services

24

organizations shall apply as well to those attorneys who practice privately and for profit but at reduced rates reflecting non-economic goals." *Id.* at 1524.

As the D.C. Circuit explained, reliance on prevailing market rates, as opposed to the prevailing party's counsel's customary rate charged to paying clients, avoids the "anomalous result" wherein "highly paid commercial, for-profit law firm can receive awards equal to its usual handsome rates . . . , [while] privately practicing but public interest motivated attorneys who intentionally charge their poorer clients reduced rates will receive the same reduced rates as statutory fees, even though they must depend upon the received fees for their livelihood." *Id.* at 1520. Reiterating this principle, the *Eley* Court emphasized that "lawyers who charge either reduced rates or on a *pro bono* basis . . . should receive fees based on the prevailing market rate charged by for-profit lawyers *if* they are doing *the same type of litigation.*" *Eley*, 793 F.3d at 105 (emphasis in original).[12]

The non-binding authority cited by the defendant agency is not to the contrary. DOL reads *American Immigration Council v. United States Department of Homeland Security*, 82 F. Supp. 3d 396 (D.D.C. 2015), to allow courts to award reasonable attorneys' fees based on the "actual rates charged and collected by [a] particular attorney, provided the attorney proves he/she generally charges and receives those rates." Def.'s Opp'n at 4. In that case, the district court awarded fees to a prevailing public interest organization, which was represented by in-house counsel with *pro bono* assistance from eight attorneys employed by a national law firm. *Am. Immigration Council*, 82. F. Supp. 3d at 409. In calculating reasonable attorneys' fees, the defendant did not oppose reimbursement for the plaintiff's *pro bono* counsel based on those

---

[12]    Though the *Eley* Court noted that the fee applicant's attorneys "always" charged paying clients at rates supplied by the *Salazar*/LSI Matrix , *Eley*, 793 F.3d at 102, the Court minimized this fact in its later analysis, *id.* at 104. In so doing, the Court confirmed, if only implicitly, that an attorney's customary billing rate holds little relevance to the calculation of a reasonable fee award under federal statutory fee-shifting provisions.

attorneys' customary billing rates. *Id.* The parties disputed, however, whether the plaintiff's in-house counsel, who had no customary hourly rates, should be reimbursed at rates supplied by the USAO *Laffey* Matrix or the *Salazar*/LSI Matrix. *Id.* at 409–10. Eschewing the "hornets' nest" presented by the selection between these competing matrices, the Court, "in the interest of both efficiency and fairness," relied on the undisputed rates supplied by the plaintiff's *pro bono* counsel as a benchmark for the hourly rates applicable to public-interest attorneys who also worked on the case. *Id.* at 410. Here, by contrast, the parties have identified no similar "tailor-made framework" for calculating the plaintiff's attorneys' appropriate hourly rates. *Am. Immigration Council*, 82 F. Supp. 3d at 410.

Nonetheless, DOL is correct that the determination of a reasonable reimbursement rate for a prevailing attorney rests, in part, on the particular billing practices of that attorney. As previously noted, *supra* Part II, the D.C. Circuit has consistently held that a fee applicant's burden in establishing a reasonable hourly rate entails a showing of three sub-elements, which include "'the [prevailing] attorneys' billing practices.'" *Salazar*, 809 F.3d at 62 (quoting *Covington*, 57 F.3d at 1107). While the *SOCM* Court firmly rejected the contention that prevailing attorneys who charge reduced rates are necessarily limited to reimbursement at below-market levels, the D.C. Circuit has since clarified that fee applicants seeking reimbursement at rates that are greater than those normally charged by their attorneys "must offer some evidence that [the applicant's attorneys] charge reduced rates for public-spirited or non-economic reasons." *Covington*, 57 F.3d at 1107–08. "That is, the attorney must show that his or her custom of charging reduced rates is in fact attributable to 'public spiritedness,'" with the opposing party "free to rebut a fee claim on these terms in cases in which the issue is posed." *Id.* at 1108. Further, though recognizing the potential difficulty in distinguishing between the

attorney who charges below-market rates because they cannot command anything more and those attorneys whose rates reflect genuine non-economic motives, the D.C. Circuit left this determination "within the sound discretion of the district court."  *Id.*

In this case, the plaintiff points to ample, undisputed evidence of her attorneys' decades-long commitment to utilizing their professional training and skills to advance a variety of public-spirited, non-economic aims.  In particular, the plaintiff notes that her lead trial counsel left corporate practice in 1994 to serve in a leadership capacity at a nationally recognized public interest organization representing federal whistleblowers.  Pl.'s Reply Supp. Pl.'s Pet. ("Pl.'s Reply") at 9, ECF No. 92.  After later practicing for some time at a successful non-profit law firm specializing in civil rights litigation, the plaintiff's lead counsel, in 2003, cofounded his present firm, which has continued to litigate successful civil rights actions in this jurisdiction.  *Id.* at 9–10.

Based on this unrefuted evidence, even assuming *arguendo* that the plaintiff's attorneys do not routinely charge rates comparable to those envisioned in the present fee petition, the plaintiff has easily met her burden of demonstrating that her attorneys are entitled to reimbursement at prevailing rates charged by attorneys engaged in complex federal litigation in the Washington, D.C. area.  Accordingly, because additional evidence of the actual rate charged by the plaintiff's counsel in this or other matters is unnecessary to resolve the present motion, DOL's request to prolong this extensive litigation in order to obtain additional discovery of the plaintiff's counsel's actual billing rates and arrangements is denied.[13]

---

[13]    Similarly, though correctly noting that the plaintiff does not seek to justify her requested rate as an "enhancement" reflecting the quality of her attorneys' work, DOL argues, again "out of an abundance of caution," that the plaintiff is not entitled to such an enhancement.  Def.'s Opp'n at 8.  Since the Court concludes that the plaintiff's requested reimbursement rate is reasonable, even absent a quality-of-work enhancement, the Court need not consider whether any enhancement is merited in this case.  *Accord Salazar*, 991 F. Supp. 2d at 49 ("Using a particular method (i.e., applying the LSI to the *Laffey* rates) to calculate attorneys' fees does *not* constitute an enhancement.").

**b.**      ***Plaintiff's Counsel's Prior Requests Are No Bar to the Plaintiff's Current Request for Reimbursement at LSI-Adjusted Rates***

DOL's next objection to the requested fee petition is related to DOL's prior argument that any fee award should be restricted to plaintiff's counsel customary rate.  Specifically, the agency seeks to advance its preferred fee matrix by pointing out that plaintiff's counsel, who has successfully litigated at least four prior Title VII against federal agencies, has never before sought a fee award based on rates exceeding those supplied by the USAO *Laffey* Matrix.  Def.'s Opp'n at 12–13.  According to DOL, this "concession is sufficient all by itself to undermine [the plaintiff's] request for *Salazar* rates because it shows—even based merely on [the plaintiff's counsel's] individual experience—the lack of any need to pay one penny more than USAO-*Laffey* rates in order to attract an adequate supply of competent counsel."  *Id.* at 13.  Even crediting DOL's suggestion that a reasonable rate need be no higher than the amount minimally necessary to ensure an adequate supply of competent counsel, a contention taken up in the section that follows, the suggestion that fee awards previously accepted by the plaintiff's counsel necessarily constrain the Court's review of the present petition is unpersuasive.

As the plaintiff explains, her counsel generally proposes relatively modest fee awards in order to avoid further litigation regarding proposed discounts or corrections to the requested award.  Pl.'s Pet. at 2 & n.3; Seldon Decl. ¶ 3.  DOL offers no rebuttal to this practical reality of fee litigation, and the Court concludes that simply because the plaintiff's counsel in the past agreed to less generous compensation to avoid further litigation (and the accrual of additional attorneys' fees), does not preclude that counsel from seeking reimbursement for the actual value of his services.  *Accord Citizens for Responsibility in Wash. v. Dep't of Justice*, 2014 U.S. Dist. LEXIS 182098, at *13 (D.D.C. Aug. 4, 2014) ("The fact that [a fee applicant] chooses to now request that its fees be based on the *Laffey* Matrix measured by the Legal Services Index of the

CPI, has nothing to do with whether its former requests [for fees based on the USAO *Laffey* Matrix] in other cases were justified or not."). Indeed, the D.C. Circuit has consistently recognized that, among the factors relevant to calculating a reasonable fee rate, the Court may consider an attorney's "skills, experience, and reputation." *Salazar*, 809 F.3d at 62 (internal quotations omitted) (quoting *Covington*, 57 F.3d at 1107). With this in mind, the plaintiff's counsel's continued success in litigating employment discrimination claims against federal agency defendants indicates increasing skill and experience in the field and counsels in favor of a more, rather than less, generous reimbursement rate reflecting the increasing valuable services rendered to the plaintiff.

### c.   *Prevailing Civil Rights Attorneys are Entitled to the Same Compensation as Other, Similarly Situated Attorneys*

Finally, and more importantly, underlying the parties' dispute regarding which *Laffey*-derived matrix is appropriate in this case is a disagreement regarding the basic purpose of federal fee-shifting statutes, and the attendant baseline the Court should use in identifying a reasonable reimbursement rate under such statutes.

DOL reads binding precedent to require that a reasonable fee award be "limited to an hour [SIC] rate that is only 'sufficient to induce a capable attorney to undertake the representation," or equivalently, that "'is adequate to attract competent counsel, but that does not produce windfalls to attorney [SIC].'" Def.'s Opp'n at 3 (quoting *Perdue*, 559 U.S. at 552). Under this view, federal fee-shifting statutes require courts to divine a reimbursement rate that is sufficient to ensure an adequate supply of minimally competent counsel prepared to take on meritorious civil rights cases, but not so generous that resulting fee awards represent a "windfall" for prevailing attorneys. *Id.* at 9. Proceeding from this premise, DOL suggests that the "overall market average would already be a generous measure, for surely average attorneys would be

worth more in the market than merely 'competent' counsel." *Id.* at 10. Under this view, an individual attorney's unique experience and expertise is largely irrelevant, since the "quality of representation [provided by the prevailing attorney] is already subsumed in the" estimation of prevailing market rates. *Id.*

By contrast, the plaintiff understands these precedents to require "rates for prevailing attorneys in civil rights cases [to] be set according to individual attorneys' *true market value* in comparison to other attorneys engaged in complex civil litigation." Pl.'s Reply at 2. Thus, the plaintiff argues, identifying a reasonable fee rate requires consideration of the rate a particular attorney would command in the private market, which in turn reflects a "'multiplicity of factors,' among them 'the level of skill necessary [to prevail in the relevant litigation] and 'the attorney's reputation." *Id.* at 6 (quoting *Copeland v. Marshall*, 641 F.2d 880, 892, 894 (D.C. Cir. 1980) (en banc)). Rejecting DOL's "lowest common denominator" approach, the plaintiff contends that, even by DOL's proposed standard, the rates supplied by the USAO *Laffey* Matrix are insufficient to ensure an adequate supply of attorneys capable of successfully litigating meritorious employment discrimination claims. *Id.* at 7.[14]

The parties' disagreement on this score is perhaps unsurprising. Indeed, precedential case law offers some support for both parties' preferred formulations of the applicable standard to identify a reasonable reimbursement rate. *Compare Perdue*, 559 U.S. at 551 (explaining that the preferred lodestar method "produces an award that *roughly* approximates the fee that the prevailing attorney would have received if he or she had been representing a paying client who was billed by the hour in a comparable case") *with Pennsylvania v. Del. Valley Citizens' Council*

---

[14]     Contrary to DOL's assertion that reliance on the USAO *Laffey* Matrix to calculate reasonable attorneys' fees ensures an adequate supply of competent counsel in Title VII actions, the plaintiff has presented evidence that the market for competent trial counsel in federal employment discrimination cases may be artificially depressed as a result of persistent under-compensation. Pl.'s Reply at 3.

*for Clean Air*, 478 U.S. 546, 565 (1986), *supplemented*, 483 U.S. 711 (1987) ("[Federal fee-shifting] statutes were not designed as a form of economic relief to improve the financial lot of attorneys, *nor were they intended to replicate exactly the fee an attorney could earn through a private fee arrangement with his client*.  Instead, the aim of such statutes was to enable private parties to obtain legal help in seeking redress for injuries resulting from the actual or threatened violation of specific federal laws." (emphasis added)).  Specifically, as previously noted, the D.C. Circuit has within the last year reached different conclusions in assessing the reasonableness of fee awards based on LSI-adjusted hourly rates.  *See supra* Part III.A.3.

　　Reviewing these authorities, DOL is surely correct that neither the Supreme Court nor the D.C. Circuit has interpreted federal fee-shifting provisions to provide that fee applicants "are entitled to whatever quality of representation they select, even the very best at the highest rates." Def.'s Opp'n at 11.  At the same time, however, this self-evident proposition does little to refute the plaintiff's view that the fee-shifting provisions of federal civil rights statutes are intended to attract competent counsel willing to take on meritorious cases without having to be underpaid by comparison to peers litigating in federal court.

　　DOL would reconcile these differing approaches in purely economic terms by setting the prevailing market rate for civil rights attorneys (*i.e.*, the rate comparable attorneys charge fee-paying in similar cases) to correspond to the rate necessary to attract a sufficient supply of attorneys to take on a particular kind of case.  Thus, as a matter of supply and demand, if the prevailing market rate is too low, either: (1) attorneys will successfully demand higher rates to induce them to enter or remain in the market; or (2) a chronic undersupply of competent attorneys to serve client needs will exist.  With these dynamics in mind, DOL notes that relatively few successful plaintiffs request reimbursement at rates greater than those supplied by

the USAO *Laffey* Matrix, which DOL suggests is indicative of the sufficiency of these rates to

ensure an adequate supply of capable attorneys to pursue meritorious civil rights claims.  Def.'s

Opp'n at 12–13.

This simple economic analysis, however, overlooks the practical realities of litigation,

which may be part of the reason that the D.C. Circuit in *Salazar* has downplayed reliance on fee

awards made in other cases as the measure of the "lodestar" prevailing rate.  *Salazar*, 809 F.3d at

64 n.1.  In reality, the reimbursement rates reflected in recent fee awards may not reflect the true

market value of services rendered by prevailing civil rights attorneys because fee-shifting often

occurs, as here, after years of litigation over substantive issues, and only after subsequent (and

increasingly complex) fee litigation.  While entirely appropriate for government and other

defendants to contest the reasonableness of fee petitions, and to ensure that prevailing attorneys

do not receive an undue windfall as a result of successful civil rights litigation, the effects of

long-delayed, and often uncertain, reimbursement has an impact both in prevailing plaintiffs'

initial fee petitions, which may request below-market rates to minimize further litigation and

hasten payment, as well as final fee awards, which may reflect particular circumstances and

considerations that may or may not be present in other, unrelated cases.[15]  In short, fee awards

are, at best, an imperfect measure of prevailing fee rates in the open market and an over-reliance

---

[15]    Both the Supreme Court and the D.C. Circuit have noted the economic pitfalls associated with long-delayed
fee awards under Title VII.  Recognizing that attorneys who prevail in Title VII actions often are not paid until well
after services are rendered, the Supreme Court permits courts to include an "enhancement for delay in payment . . . ,
where appropriate, [as] part of a reasonable attorney's fee."  *West*, 717 F.3d at 1034 (quoting *Missouri v. Jenkins,*
491 U.S. 274, 282 (1989)).  The plaintiff has requested no such enhancement in the present case.  Nonetheless, the
possibility of prolonged fee litigation underscores the incentive for prevailing attorneys to avoid such litigation
entirely by requesting reimbursement below prevailing market rates.

on past fee awards as evidence of the prevailing market rate for a particular category of legal services may distort the true value of those services in the Washington, D.C. area.[16]

In any event, the D.C. Circuit has not opined about these concerns in detail, but nonetheless has broadly rejected DOL's limited construction of federal fee-shifting provisions. In *Salazar*, the defendant argued that "[t]he rate awarded must be the rate that will attract 'capable' or 'competent' counsel, not a top-of-the-market rate," and thus contended that the district court erred in awarding rates "charged by the largest law firms in the country, . . . which far exceed those necessary to attract and maintain competent counsel." *See* Brief for Appellant, at 54, *Salazar*, 809 F.3d 58 (Nos. 14–7035, 14–7050), 2014 WL 7387253, at *54 (citing *Perdue*, 559 U.S. at 552; *Blum*, 465 U.S. at 893–94). In response, however, the D.C. Circuit observed that the District, both before the district court and on appeal, failed to put forward "relevant arguments" to rebut the district court's conclusion that LSI-adjusted rates were appropriate. *Salazar*, 809 F.3d at 65. Specifically, while the defendant made much of the continued expenditure of public funds "in a case in which Plaintiffs no longer need to pay LSI updated *Laffey* rates to 'attract competent counsel,'" *id.* (quoting Brief for Appellant, at 54, *Salazar*, 809 F.3d 58 (Nos. 14–7035, 14–7050), 2014 WL 7387253, at *49), the Court reiterated that reasonable attorneys' "fees should be neither lower, nor calculated differently, when the losing defendant is the government," *id.* (quoting *Salazar*, 991 F. Supp. 2d at 49).

Further, this clear rejection of DOL's view that reasonable reimbursement rates need be no higher than the rate necessary to attract minimally competent counsel is consistent with longstanding precedent in this Circuit. *See SOCM*, 857 F.2d at 1521 ("It is not inconsistent with

---

[16] This concern is particularly acute when a significant proportion of fee awards in a category of civil rights cases are litigated simultaneously and resolved by a single Magistrate Judge, giving those cases an outsized influence in resolving subsequent fee petitions. *See Jones*, 2015 WL 9907797, at *9 & n.8.

the avoidance of windfalls to pay attorneys at rates commensurate with prevailing community standards of attorneys of like expertise doing the same sort of work in the same area."); *Covington v. District of Columbia*, 839 F. Supp. at 849 (D.D.C. 1993), *aff'd*, 57 F.3d 1101 (D.C. Cir. 1995) ("Just because some lawyers are willing to take some civil rights, employment, or discrimination cases at low-end rates . . . , does not establish [those rates] as the prevailing market rate for [civil rights, employment, and discrimination litigation in the District of Columbia]." (alteration in original)).  Instead, consistent with *Eley* and *Salazar*, to identify a reasonable reimbursement of the plaintiff's lead counsel in this case, the Court must consider whether the plaintiff has carried her burden of demonstrating that the reimbursement rate she requests in connection with her lead counsel's successful work at trial reflects prevailing compensation rates for attorneys of like expertise doing similar work in the Washington, DC area.

### 2. *Establishing the Prevailing Market Rate*

With these antecedent issues resolved, the parties' central dispute regarding the relative merits of their preferred fee matrices comes to the fore.  Based on the foregoing discussion of the relative merits of the USAO *Laffey* Matrix and the *Salazar*/LSI Matrix generally, as well as the particular evidence submitted by the parties in connection with the present petition, the plaintiff has carried her burden of justifying her request for an incremental award of $92,536.00.

At the outset, to the extent that DOL continues to read *Eley* to foreclose the use of the *Salazar*/LSI Matrix to calculate reasonable attorneys' fees in the Washington DC area, this reading was categorically rejected by the D.C. Circuit in *Salazar*.  In fact, far from conclusively rejecting the use of this matrix to calculate reasonable attorneys' fees, the *Salazar* Court explicitly noted that the "district court's selection of LSI *Laffey* rates is *consistent* with [the]

intervening decision in *Eley*." *Salazar*, 809 F.3d at 64 (alteration in original) (emphasis added)
(explaining that, unlike in *Eley*, the award based on the *Salazar*/LSI Matrix was appropriate
because the district court "required the Plaintiffs to demonstrate the propriety of the rates they
sought"). Thus, the *Salazar* Court emphasized that where, as here, the defendant "concedes that
the relevant market is that of complex federal litigation, the only issue is whether [the plaintiff]
submitted sufficient evidence for the . . . court to conclude that the LSI *Laffey* Matrix applies."
*Id.* With this in mind, to determine whether the plaintiff is entitled to reimbursement at an
enhanced rate, the evidence submitted by the parties in connection with the present petition
requires close review.

Under the applicable burden-shifting framework, the Court must consider first whether
the plaintiff has met her burden of "justifying the reasonableness of [her requested] rates." *Eley,*
793 F.3d at 100 (citation omitted). In support of her request for an incremental award, the
plaintiff supplements its reliance on this Court's discussion in *Eley*, with the following evidence:
(1) a declaration from her counsel describing his extensive experience over nearly four decades,
including four prior federal employment discrimination cases against federal agencies
successfully tried to verdict and at least three prior gender discrimination complaints against the
DOL OIG, as well as his contention that the maximum hourly rate afforded by the USAO *Laffey*
Matrix fails to account for his unique "expertise, experience, and capability," Seldon Decl. ¶¶ 2,
8, 30; (2) a declaration from a senior litigation partner at a large Washington-based law firm,
who has served as fee counsel for prevailing civil rights plaintiffs and, having reviewed the
present fee petition and rates charged by experienced attorneys for similar services in the
District, avers that the plaintiff's requested reimbursement rate is "reasonable and consistent with
the prevailing market rates in the DC metropolitan area," Decl. Steven K. Davidson (Apr. 20,

2015) ("Davidson Decl.") ¶¶ 1, 6, 8, 22, ECF No. 85-2; (3) a declaration from a senior litigator at

a Washington-based law firm specializing in civil rights litigation, who attests that the rates

included on the USAO *Laffey* Matrix are "well below the market for skilled litigators in federal

court," that his own rate is greater than the plaintiff's requested rate, and that paying clients of

his firm have paid rates greater than those included on the *Salazar*/LSI Matrix, Decl. John P.

Relman (Apr. 20, 2015) ("Relman Decl.") ¶¶ 3, 4, 16, 18, ECF No. 85-3.

      Beyond evidence of the *Salazar*/LSI Matrix itself, this additional evidence persuasively

establishes that the plaintiff's requested rate is reasonable in this case.  Indeed, in addition to the

plaintiff's counsel's own recitation of his extensive, directly relevant experience, Seldon Decl. ¶¶

17–25, the plaintiff offers evidence falling into each of the relevant categories identified by the

D.C. Circuit in *Eley*.  For example, the plaintiff has presented evidence comparing the results of

a 2014 National Law Journal billing survey, which includes rate data for twelve national law

firms based in Washington, D.C., to the plaintiff's requested rate.  Davidson Decl. ¶ 19, Ex. B.

This evidence shows that partner billing rates at these firms tends to vary between an average

low-end rate of $571.67 per hour to an average high-end rate of $1,032.92 per hour, and that the

plaintiff's requested rate is within $50 of the average hourly rate for partners at these firms.  *Id.*

(further explaining that, based on his extensive, relevant experience, the plaintiff's counsel's

hourly rate likely would be higher than the average partner's hourly rate).

      Additionally, the affidavits supplied by the plaintiff suggest that attorneys with similar

qualifications regularly charge higher rates than even those supplied by the *Salazar*/LSI Matrix,

Relman Delc. ¶¶ 16, 17 (indicating that the affiant's own customary rate has been higher than the

plaintiff's requested rate throughout the last three years and that the affiant is "aware that the

[requested rate] is below the rate charged by skilled civil litigators with twenty or more years of

experience in the Washington, D.C. market"), and provide examples of recent fee awards based on the *Salazar*/LSI Matix to attorneys with comparable qualifications handling similar cases, Davidson Decl. ¶ 16, 18 (citing *Citizens for Responsibility in Wash.*, 2014 U.S. Dist. LEXIS 182098; *Salazar*, 991 F. Supp. 2d at 47; *Eley*, 999 F. Supp. 2d 137; *McKesson Corp. v. Islamic Republic of Iran*, 935 F. Supp. 2d 34, 43 (D.D.C. 2013)); *see also Citizens for Responsibility & Ethics in Wash.*, 80 F. Supp. 3d at 3.

While not mentioned by either party, the Court notes that the District of Columbia recently adopted the *Salazar*/LSI Matrix as a means of calculating recoverable attorneys' fees in actions to enforce various wage and hour laws. *See* Wage Theft Prevention Amendment Act of 2014, 2014 District of Columbia Laws 20-157 (Act 20-426) §§ 2(f), 2(h). Thus, under D.C. law, prevailing plaintiffs alleging violations by employers of the minimum wage and other wage requirements are entitled to "attorney's fees computed pursuant to the matrix approved in *Salazar v. District of Columbia*, 123 F.Supp.2d 8 (D.D.C. 2000), and updated to account for the current market hourly rates for attorney's services." D.C. Code Ann. §§ 32-1308(b)(1), 32-1308.1(m)(1). Given that reasonable attorneys' fees are intended to reflect, in part, the prevailing market rate in the relevant community, this endorsement of the *Salazar*/LSI Matrix by the local governing body in the context of wage enforcement litigation provides additional evidence that the rates included in this matrix are equally reasonable in the context of arguably more complex gender discrimination suits brought under a federal civil rights statute.

Particularly in light of the D.C. Circuit's recent observation that the *Salazar*/LSI Matrix represents a conservative estimate of the prevailing market rate for legal services in the District, this evidence demonstrates that the plaintiff's requested rate is presumptively reasonable in this case. Indeed, the plaintiff's requested rate is well within the range of reported partner rates at

major law firms in the Washington, D.C. area.  Given the plaintiff's attorney's extensive,

relevant experience in litigating employment discrimination cases to a verdict, the plaintiff's

request for reimbursement for a portion of his work in this case, at a rate only slightly higher

than the *average* reported partner rate in the District, is surely justified.

### 3.  *The Defendant Has Not Rebutted the Plaintiff's Evidence of the Prevailing Market Rate for Her Attorney's Services*

With the plaintiff having met her initial burden, DOL fails to marshal sufficient evidence

to rebut the presumption that the plaintiff's requested rate is reasonable and instead revives

numerous arguments already considered and rejected by this Court and the D.C. Circuit.  Relying

primarily on a declaration from its own expert, DOL contends that the USAO *Laffey* Matrix is a

"far better measure of the actual market than the [*Salazar*/LSI Matrix]."  Def.'s Opp'n at 10–11.

Taken together, however, the evidence presented by the defendant does little to refute the

specific evidence the plaintiff presents regarding both her attorney's extensive, relevant

experience in the field of federal employment discrimination law, as well as the prevailing

hourly rates for attorneys engaged in comparable cases in this jurisdiction.

As an initial matter, to the extent that DOL suggests that the USAO *Laffey* Matrix

provides a more accurate estimation of the actual market rate for legal services *in general*, this

argument is difficult to square with the D.C. Circuit's recent observation that the *Salazar*/LSI

Matrix provides a "conservative" estimate of prevailing local rates for "complex federal

litigation."  Indeed, as previously noted, the *Salazar* Court's holding was based, in part, on its

review of similar comparisons between recent rate survey data and the rates provided by each of

the competing *Laffey*-derived matrices.  *Salazar*, 809 F.3d at 65.  DOL's present submissions do

little to distinguish the present case or to otherwise undermine the conclusion of both this Court

and the D.C. Circuit that the *Salazar*/LSI Matrix tends to represent a low-end estimate of the

prevailing market rate for legal services performed in connection with complex federal litigation in the District of Columbia.  Moreover, DOL offers nothing to refute the plaintiff's persuasive evidence that the *Salazar*/LSI Matrix more actually reflects the rate the plaintiff's counsel would receive in the private market.  Indeed, in opposition to the present petition, DOL does not contest that the plaintiff's lead counsel has developed deep experience in the field of employment discrimination, including a number of favorable verdicts at trial, over the course of his nearly forty year career litigating in this jurisdiction and federal courts across the country.  In the face of this additional evidence, DOL's broad suggestion that the *Salazar*/LSI Matrix is unreasonably generous is simply unavailing.

Much the same, DOL's effort to relitigate this Court's prior analysis of the differing data underlying the competing *Laffey* matrices, *id.* at 13–14, 16–20, cannot overcome the specific, additional evidence submitted by the plaintiff in support of her requested rates.  At the outset, DOL grossly mischaracterizes the origins of the *Salazar*/LSI Matrix.  DOL describes the rates supplied by this matrix as "trace[d] back to the [rates] charged by two attorneys in a single case, as attested to in a single declaration."  Def.'s Opp'n at 13–14.  As support for this proposition, DOL cites the D.C. Circuit's holding in *SOCM*, but this is, at best, a glaring misreading of that decision.  In fact, the cited text explains that a *prior* panel of the D.C. Circuit had concluded that customary rates charged by two public interest attorneys were a reasonable basis for a fee award under a federal environmental statute.  *SOCM*, 857 F.2d at 1518.  As previously noted, the D.C. Circuit, sitting en banc, rejecting this prior holding and held instead that private attorneys who charge reduce rates reflecting non-economic goals must be reimbursed at the prevailing market rate for attorneys working at traditional for-profit forms.  *Id.* at 1524.

Indeed, contrary to the defendant's unsupported description of the genesis of the

*Salazar*/LSI Matrix, this Court has explained that the starting points for both the USAO *Laffey*

Matrix and the *Salazar*/LSI Matrix are survey data of legal rates in the Washington, D.C. area.

*Eley*, 999 F. Supp. 2d at 150.   In fact, the *Salazar*/LSI Matrix is based on *more recent* survey

data than the USAO *Laffey* Matrix.   *Id.* (explaining that the USAO *Laffey* Matrix is based on

survey data reflecting "hourly legal billing rates . . . 'for work done principally in 1981–82,'"

quoting *Laffey*, 572 F. Supp. at 354, while the "LSI-adjusted matrix is based on a survey of legal

rates in the Washington, D.C. area conducted in 1989").   For this reason, among others, this

Court and others have concluded that the *Salazar*/LSI Matrix is a more reliable indicator of the

actual prevailing market rate for legal services in the District and reflects, at worst, a

conservative estimate of those rates.   *See Citizens for Responsibility & Ethics in Wash.*, 80 F.

Supp. 3d at 3; *Salazar*, 991 F. Supp. 2d at 48; *Eley*, 999 F. Supp. 2d at 154.

Beyond this initial mischaracterization, DOL puts forward little new evidence to suggest

that the plaintiff's LSI-adjusted rates are inconsistent with rates commanded by similarly situated

attorneys engaged in complex federal litigation in the District of Columbia.   Opposing the

present petition, DOL relies principally on a declaration by its own expert economist who, based

on her review of a 2011 rate survey of Washington-area attorneys, avers that the USAO *Laffey*

Matrix is "approximately the same as . . . the overall billing rates of firms in the DC area."   Decl.

Dr. Laura A. Malowane (May 11, 2015) ("Malowane Decl.") ¶¶ 12–13, ECF No. 89-1.   This

declaration puts forward three primary arguments.[17]   First, comparing data from a survey of all

---

[17]     As explained above, this emphasis on identifying "average" market rates stems from a flawed reading of
this Circuit's precedent regarding reasonable attorneys' fees under federal fee-shifting statutes.  *See supra* Part
III.B.1.c.  Much the same, though the defendant's expert observes that the plaintiff's requested reimbursement rate
"does not appear to reflect [her attorney's] own actual rates," Malowane Decl. ¶ 14, this speculative observation is
largely irrelevant to the determination of a reasonable reimbursement rate under Title VII, *see supra* Part III.B.1.a.

practicing attorneys in the Washington, D.C. area to each *Laffey*-derived matrix, the expert notes that the USAO *Laffey* Matrix more closely approximates reported average rates in this jurisdiction.  Malowane Decl. ¶¶ 11–15.  Second, contending that attorneys at large law firms generally charge higher billing rates than their peers at smaller firms, DOL's expert avers that survey data reflecting the billing rates of only large firms presents a skewed picture of the average rates charged by the majority of attorneys in a given locality and should therefore not be used as the prevailing market rate.  Malowane Decl. ¶¶ 16–31.  Finally, DOL's expert testifies that the Washington, D.C.-specific CPI, as opposed to the national LSI, more accurately estimates the increase in the average cost of legal services in the District.  Malowane Decl. ¶¶ 32–50.  Each of the arguments is examined in turn below.

a.      ***Recent Survey Data Favor LSI-Adjusted Rates***

As the D.C. Circuit has recognized, timely and accurate information demonstrating hourly rates actually charged by Washington, D.C.-area attorneys is particularly probative of prevailing market rates in this jurisdiction.  *Eley*, 793 F.3d at 100.  In principle, to determine which *Laffey*-derived matrix most accurately reflects prevailing market rates, the best evidence of this sort would be comprehensive survey data regarding actual fees charged and collected by Washington, D.C.-area attorneys engaged in complex federal litigation.  Unfortunately, such data may be not be readily available, and in any event, neither party provides evidence of this sort.  Instead, like the inflation data analyzed by this Court in *Eley*, *see supra* Part III.A.1., the survey data provided by the parties provide, at best, an imperfect account of the actual fees charged and collected by attorneys in this jurisdiction for cases comparable to the plaintiff's successful Title VII action.  The strengths and weaknesses of this survey data are outlined below.

41

First, as previously noted, the plaintiff's expert relies primarily on a 2014 National Law Journal billing survey that reflects the rates charged by twelve national law firms based in Washington, D.C.  Davidson Decl. ¶ 19, Ex. B.  According to this expert, this survey suggests that the plaintiff's requested rate is within $50 of the average hourly rate for partners at these firms.  *Id.*  This survey provides the most recent data regarding rates charged by Washington, D.C.-area attorneys and includes granular information regarding rates charged by attorneys of differing levels of experience and seniority.  *Id.*  Although this survey data is not tied to any particular type of litigation, the plaintiff's experts fill this gap by declaring that the plaintiff's requested rate is well within the reasonable range of rates for attorneys undertaking similar matters for paying clients in the Washington, D.C. area.  Davidson Decl. ¶ 13; Relman Decl. ¶ 17.  At the same time, however, this survey reflects the rates charged by only a subset of Washington, D.C.-based attorneys, which, according to DOL's expert, may not be in line with rates that prevail in the broader legal market in this jurisdiction.  Malowane Decl. ¶¶ 21–25.

In response, DOL's expert focuses instead on a 2011 survey conducted by ALM Legal Intelligence, which "provides data of actual billing rates of attorneys in the Washington, DC area, from law offices of all sizes and types."  *Id.* ¶ 12.  While this data has the advantage of capturing reported rates charged by attorneys in this jurisdiction, the declaration provided by DOL leaves some doubt as to whether this survey fairly estimates the prevailing rate for experienced attorneys engaging in complex federal litigation.  Most notably, the inclusion of rates charged by attorneys across all practice areas significantly undermines the degree to which this survey fairly reflects rates charged by attorneys engaged principally in complex federal litigation.

Thus, while DOL's expert highlights the differing rates charged by attorneys working at firms of varying size, *see infra* Part III.B.3.b., she fails to acknowledge that rate variations may also be attributable to a number of other significant factors. For example, though the expert characterizes this survey as "actual billing rates" of attorneys in the District, this expert does not indicate whether this survey incorporates only those fees charged on an hourly basis. The inclusion of rates charged on a contingency or flat-fee basis potentially undercuts any purported correlation between this survey and rates collected by attorneys engaged in complex federal litigation, which charge most often by the hour. Likewise, to the extent that this survey incorporates rates charged for services unrelated to, and potentially less demanding than, the employment discrimination claim litigated in this case, the resulting rates may diverge substantially from those commanded by attorneys providing services similar to those for which the plaintiff seeks reimbursement.

Indeed, as recently as 2012, the defendant agency's own expert provided testimony to the U.S. Court of Federal Claims that attorneys who prevail in federal civil rights litigation are entitled to fees comparable to those requested by the plaintiff in her present petition. *Biery v. United States*, Nos. 07-675L, 07-693L, 2012 WL 5914260, at *4 (Fed. Cl. Nov. 27, 2012). There, arguing in favor of the fee applicant's request for reimbursement at prevailing market rates in the Washington, D.C. area, DOL's expert averred that plaintiffs "needing specialized counsel" should be reimbursed at the "national rates" charged by their attorneys' law firms, as opposed to the lower rates that may prevail in secondary legal markets. *Id.* Relying on an earlier version of the survey advanced by the plaintiff in this case, DOL's expert concluded in that case that hourly partner rates of between $705 and $706 per hour are "within the range of rates charged" by "'national' firms based in Washington, D.C.[, which] range between $195 and

$990." *Id.*  As other Judges in this Circuit have noted, these hourly rates "are also comparable with the rates produced by use of the LSI Methodology."  *Citizens for Responsibility & Ethics in Wash.*, 2014 U.S. Dist. LEXIS 182098, at *15 n.4.

Consistent with the opinion of DOL's own expert offered in *Biery*, survey data reflecting rates charged by attorneys at national law firms fairly estimates the prevailing rate for attorneys engaged in complex federal litigation in this jurisdiction.  Accordingly, evidence of rates charged by all attorneys in the District of Columbia, regardless of the nature of their experience or practice, does little to suggest that reimbursement for services in connection with successful complex federal litigation at LSI-adjusted rates is unreasonable.

> **b.      *Reasonable Rates are Determined by an Attorney's Skill, Experience, and Reputation, not Firm Size***

Similarly, DOL's effort to cast the rates its own expert espoused in another federal civil rights litigation as appropriate only for attorneys practicing at the largest Washington-area law firms is unavailing.

Notwithstanding her prior testimony in *Biery*, DOL's expert avers that, because "[l]aw firm billing rates generally differ with the size, region and scope of the firm," the billing rates commanded by the plaintiff's attorneys, who practice at a boutique firm specializing in civil rights litigation, "are not comparable to those at large multi-office, multinational law firms." Malowane Decl. ¶¶ 16–25.  In an apparent effort to diminish the impact of her prior opinion in *Biery*, DOL's expert takes pains to frame that opinion as addressing only the degree to which survey data reflecting billing rates among the nation's largest firms may be used to identify the appropriate reimbursement rate for "similarly sized firms with their principal office location in Washington, D.C." *Id.* ¶ 25.  Thus, reviewing the plaintiff's asserted survey data, DOL's expert opines that the plaintiff's requested rate "more accurately reflect[s] the billing rate of partners at

the largest firms in Washington, DC." *Id.* ¶ 20. Drawing on this opinion, DOL contends that reimbursement at the plaintiff's requested rate would entitle prevailing plaintiffs to "whatever quality of representation they select, even the very best at the highest rates." Def.'s Opp'n at 11.

As this Court has explained, however, "such differentiation [between the prevailing rates for larger and smaller firms] has been explicitly rejected by the Supreme Court and the D.C. Circuit." *Eley*, 999 F. Supp. 2d at 155. Thus, the D.C. Circuit has firmly held that "the prevailing market rate method . . . used in awarding fees to traditional for-profit firms . . . [applies] as well to those attorneys who practice privately and for profit but at reduced rates reflecting non-economic goals." *SOCM*, 857 F.2d at 1524. Indeed, in both *Laffey* and *Salazar*, the prevailing attorneys practiced not at large multi-national law firms, but at small boutique firms—not unlike the firm at which the prevailing attorneys in this case practice—specializing in federal civil rights litigation. *See Laffey*, 746 F.2d at 7; Brief for Appellant, at 54, *Salazar*, 809 F.3d 58 (Nos. 14–7035, 14–7050), 2014 WL 7387253, at *54.[18] With rate parity ensured, the *SOCM* Court explained, "[p]ublic interest lawyers will continue to provide the specialization, freedom from conflicts with private clients, readiness to take on unpopular cases, and willingness to carry the cost of protracted cases that is indispensable to full enforcement [of federal civil rights statutes]." 857 F.2d at 1521 (internal quotations omitted) (quoting Samuel R. Berger, *Court Awarded Attorneys' Fees: What Is "Reasonable"?*, 126 U. PA. L. REV. 281, 323 (1977)).

Indeed, there is good reason to believe that reported rates of national law firms, as opposed to data reflecting rates charged by *all* attorneys in a given locality, more accurately reflects the prevailing market rate for attorneys engaged in complex federal litigation. Though

---

[18]     In fact, as described above, the plaintiffs in *Salazar* was reimbursed at LSI-enhanced rates for their attorneys' ongoing efforts to monitor the District of Columbia's compliance with a consent order entered in 1999. *Salazar*, 809 F.3d at 61. Though this work involved certain follow-on litigation, *id.*, this later litigation likely did not present the numerous challenges that arise where, as here, a matter is litigated for the first time.

likely serving most often as defense counsel, attorneys at large, national law firms have the resources and personnel necessary to manage effectively and successfully the numerous challenges presented by complex litigation. Much the same, since federal litigation generally involves application of uniform laws or rules that apply nationally, rates charged by attorneys engaged in such litigation are more likely to be consistent throughout the country and less likely to be driven by local market forces. Decl. Dr. Laura A. Malowane (Dec. 20, 2011) ¶¶ 10–11, *Biery* (Nos. 07-675L, 07-693L), ECF No. 92-2.

Thus, it is of no moment that the survey data relied upon by the plaintiff reflect the billing rates at large Washington-based firms, as opposed to rates typically charged by attorneys at smaller, public service-minded firms. To justify her proposed reimbursement rate, the plaintiff need demonstrate only that her requested rate is "in line with those prevailing in the community *for similar services by lawyers of reasonably comparable skill, experience and reputation*." *Eley*, 793 F.3d at 100 (emphasis added) (citation omitted). As previously discussed, the plaintiff's submissions in addition to her counsel's own affidavit demonstrate that similarly qualified attorneys engaged in complex civil litigation demanding resolution at trial are generally compensated at rates comparable to those proposed in her present petition.

c.    ***The LSI Reasonably Approximates Changes in the Cost of Complex Federal Litigation in the District of Columbia***

Finally, DOL invites the Court to reconsider the conclusion reached in *Eley* that the LSI most accurately estimates the annual change in prevailing market rates for legal services in the District of Columbia.[19] In *Eley*, this Court explained that neither the nationwide LSI nor the

---

[19]    In so doing, DOL initially dismisses the distinction between the LSI and the CPI as a "debate-within-a-debate," and "secondary in importance to the gold standard of actual, recent market data." Def.'s Opp'n at 16. While DOL is no doubt correct that reliable evidence of actual rates charged by Washington, D.C.-area attorneys is a helpful indicator of prevailing market rates for legal services in the District, this argument fails on its own terms. As discussed above, the expert evidence submitted by the defendant falls well short of demonstrating that the plaintiff's

Washington, D.C.-specific CPI precisely measure the increase in rates for attorneys engaged in complex federal litigation in this jurisdiction.  999 F. Supp. 2d at 154.  On balance, however, this Court concluded that the LSI "appears to be a more accurate reflection of the cost of legal services both in this community and nationwide."  *Id.*

Undeterred, DOL now contends that the LSI cannot accurately reflect pricing changes associated with complex federal litigation because it incorporates various legal services that are unrelated to the civil rights litigation that underlies the present fee petition.  As DOL explains, in addition to measuring changes in the cost of such services as "[p]reparing a brief" and "[a]ttending a deposition," the LSI reflects price changes associated with a number of unrelated services, including "uncontested wills and divorces, powers of attorney, and traffic violations."  Def.'s Opp'n at 16–17; Malowane Decl. ¶ 35 & n.25.  According to DOL's expert, these latter services are billed most often at flat rates, as opposed to the hourly bill rates reflected in most complex federal litigation.  Malowane Decl. ¶¶ 42–46.  Thus, in the expert's view, the LSI "can and should be used only to measure average urban price changes for simple and consumer driven legal services," and not the sort of complex litigation at issue here.  *See id.* ¶¶ 35–37 & n.25.

In support, DOL's expert describes a number of distinctions between the market for local, consumer-driven legal services and the market for services in connection with complex federal litigation.  *Id.* ¶¶ 35–41.  Missing from this analysis, however, is anything to suggest that the inclusion of relatively simple legal services (*e.g.*, no-fault divorce proceedings or simple traffic violations) in the LSI tends to *over*-estimate the increase in the cost of legal services for parties

---

requested rates are not in line with prevailing rates typically charged by similarly situated attorneys in the District. In fact, the D.C. Circuit's recent endorsement of the *Salazar*/LSI Matrix as a conservative estimate of prevailing market rates for legal services in the District was based, in part, on its comparison of rates provided by the *Salazar*/LSI Matrix with prevailing rates identified in recent surveys of Washington, D.C.-based attorneys.  *Salazar*, 809 F.3d at 65.

engaged in complex federal litigation.  *See generally id.*  Indeed, if anything, the inclusion of

such relatively simple, and likely comparatively inexpensive, services in the LSI suggests that

the actual increase in the cost of services like those rendered in the present case rise *more* rapidly

that the overall LSI would suggest.  In this sense, the *Salazar*/LSI Matrix may in fact represent a

more conservative estimate of the increase in the prevailing cost for complex federal litigation

services than previously considered.

Further muddying the proverbial waters, DOL suggests yet another inflation index as the

most reliable measure of the actual increase in the cost of legal services in this jurisdiction.

Specifically, DOL's expert contends that the Producer Price Index for attorneys engaged in civil

negligence actions ("PPI-Civil Negligence") provides "pricing changes for services that are close

in nature and complexity to federal litigation."  Malowane Decl. ¶¶ 48–50.[20]  Comparing this

index with the LSI and CPI, the expert notes that the PPI-Civil Negligence more closely tracks

the Washington, D.C.-specific CPI.  *Id.*  Thus, the expert reasons, the USAO *Laffey* Matrix,

which is adjusted using the Washington, D.C.-specific CPI, more accurately reflects the true

increase in the cost of legal services in the District of Columbia.  *Id.*

Again, however, missing from this analysis is any explanation of why the newly

identified PPI-Civil Negligence is a more reliable indicator of the actual change in rates charged

by attorneys engaged in complex federal litigation.  In fact, this newly identified index is likely

ill-suited to measure changes in the billing rates for such attorneys for at least two reasons.  First,

as the plaintiff correctly notes, plaintiffs' attorneys engaged in civil negligence actions almost

universally bill on a contingency basis.  Pl.'s Reply at 19 n.7.  As a result, these attorneys quite

---

[20]        In contrast to the CPI, which measures changes in the costs consumers pay for goods and services, the PPI measures the change in selling prices for businesses that provide goods and services to consumers.  *See* Bureau of Labor Statistics, *Producer Price Indexes*, http://www.bls.gov/ppi/ppiover.htm (last modified Feb. 18, 2015).

often receive *no* compensation for their services on behalf of their clients, potentially depressing significantly the rate at which costs associated with these services increase over time.

Second, even assuming these attorneys are regularly compensated for their time, there is little reason to suspect that attorneys engaged in civil negligence actions command rates comparable to their colleagues who litigate successful federal civil rights cases.  Civil negligence actions turn nearly exclusively on state law, and are litigated most frequently in state courts. Though they share certain facial similarities, the services rendered by the plaintiff's attorneys in pursuing her successful employment discrimination claims are meaningfully different than those rendered in a standard slip-and-fall or products liability action.  As explained above, *supra* Part I, the present case, like many federal civil rights cases, involved numerous difficult challenges, which were complicated further by the defendant agency's conduct prior to and during trial. Successfully navigating these treacherous waters posed more significant demands than presented in an uncomplicated civil negligence action.  As such, the Court is not convinced that DOL's proposed inflation index more closely approximates the actual change in the cost of the legal services rendered to the plaintiff in this case.

Finally, DOL observes that the D.C. Circuit utilizes the general CPI, as opposed to the LSI, to calculate the reimbursement rate for prevailing attorneys under the Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412.  Def.'s Opp'n at 19 (citing *Haselwander v. McHugh*, 797 F.3d 1, 3 (D.C. Cir. 2015) (*per curiam*)).  Thus, DOL reasons, if the CPI is "sufficient" for purposes of the EAJA it "should work for the other fee-shifting statutes as well."  *Id.*  Though offering some facial appeal, DOL's underdeveloped reasoning on this front does not withstand close scrutiny.  Under the EAJA, Congress capped attorneys' fee awards at $125/hour "unless the court determines that an increase in the cost-of-living . . . justifies a higher fee."  28 U.S.C. §

2412(d)(2)(A).  By its terms, then, the EAJA allows courts to adjust the maximum reimbursement rate available to prevailing plaintiffs based only on the rise in the *cost of living* in the relevant community.  Consistent with the explicit text of the governing statute, the D.C. Circuit has concluded that the best estimate of this broader metric is the increase of the cost of *all* goods and services in the Washington, D.C. area.  *See, e.g.*, *Role Models Am., Inc. v. Brownlee*, 353 F.3d 962, 969 (D.C. Cir. 2004) (collecting cases).

This unremarkable conclusion has little bearing, however, on the present inquiry.  Here, the Court is focused not on the increase in the cost of living, but instead on the prevailing hourly rate for attorneys' providing legal services in complex federal litigation.  As this Court has explained, the "local CPI for all goods and services includes such diverse items as personal computer prices, funeral expenses, and movie tickets," *Eley*, 999 F. Supp. 2d at 153, and is therefore a reliable metric for estimating the increase in the general cost-of-living in the Washington, D.C. area.  The diverse basket of goods comprising the broader CPI "heavily masks the changes in rates for legal services," however.  *Id.*  By contrast, the LSI "has the distinct advantage of capturing the more relevant data because it is based on the legal services component of the [CPI]."  *Id.* at 152 (internal quotations omitted) (quoting *Salazar v. District of Columbia*, 750 F. Supp. 2d 70, 73 (D.D.C. 2011)).  For this reason, it is entirely logical to use the broad-based CPI to estimate the increase in the general cost of living in the District while instead using the LSI to estimate the more specific increase in the market rate for legal services in this jurisdiction.

*          *          *

In sum, DOL's efforts to resurrect familiar arguments regarding the relative strengths of the USAO *Laffey* and *Salazar*/LSI matrices are largely foreclosed by recent binding Circuit precedent.  Guided by the D.C. Circuit's consideration of the precise question at issue in the present dispute, the Court concludes that the plaintiff has met her burden of justifying reimbursement at the applicable rate supplied by the *Salazar*/LSI Matrix for her lead counsel's successful efforts in preparation for and during trial.

## IV.    CONCLUSION

For the reasons outlined above, the plaintiff's petition for reimbursement for part of her attorneys' fees at the rate supplied by the *Salazar*/LSI Matrix is granted.  In addition to the fees to which the parties have already stipulated, the plaintiff is entitled to reimbursement under the *Salazar*/LSI Matrix for 344 hours of attorney time related to trial preparation and presentation at an hourly rate of $789.  An appropriate order will accompany this Memorandum Opinion.


Date: February 8, 2016


                                        _____
                                        BERYL A. HOWELL
                                        United States District Judge